# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| NASDAQ, INC.; NASDAQ ISE, LLC; AND FTEN, INC.; | : | |
|  | : | Civil Action 3:17-cv-06664-BRM-DEA |
| Plaintiffs, | : | |
| v. | : | |
| MIAMI INTERNATIONAL HOLDINGS, INC., et al., | : | **Oral argument is requested** |
|  | : | |
| Defendants. | : | |
|  | : | |

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO DISQUALIFY FISH & RICHARDSON P.C.

# **TABLE OF CONTENTS**

**PAGES**

TABLE OF AUTHORITIES

I.      INTRODUCTION .................................................................................1

II.     FACTUAL BACKGROUND.................................................................3

    A.      The Prior Representation of Nasdaq, Inc. .............................3

    B.      The Current Litigation..........................................................4

    C.      Fish's Limited Engagement by MIAX..................................5

III.    LEGAL ARGUMENT ..........................................................................9

    A.      Fish is permitted to limit the scope of its representation
        of MIAX ..............................................................................10

    B.      Plaintiffs cannot carry their burden to justify
        disqualification ...................................................................21

        i.      Neither ISE nor FTEN are "former clients" of Fish .................23

        ii.     The various matters are not "substantially related"..................29

        iii.    Imputation of any alleged conflict to Fish is
        inappropriate ...........................................................33

    C.      Even if there were a conflict, disqualification is
        inappropriate.......................................................................33

IV.     CONCLUSION....................................................................................40

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Asyst Tech., Inc. v. Empak, Inc.*,
  962 F. Supp. 1241 (N.D. Cal. 1997)............................................................26, 27

*Atasi Corp. v. Seagate Tech.*,
  847 F.2d 826 (Fed. Cir. 1988) ...........................................................................26

*Audio MPEG, Inc. v. Dell, Inc.*,
  219 F. Supp. 3d 563 (E.D. Va. 2016) ................................................................26

*Buysse v. Baumann-Furrie & Co.*,
  448 N.W.2d 865 (Minn. 1989) .............................................................16, 18, 20

*Cafaro v. HMC Int'l, LLC*,
  No. 07-cv-2793, 2012 WL 4857763 (D.N.J. 2012)...............................12, 23, 34

*California Self-Insurers' Sec. Fund v. Superior Court of Orange Cty.*,
  228 Cal. Rptr. 3d 546 (Cal. App. Div. 2018) ...............................................38, 39

*Cardona v. General Motors Corp.*,
  942 F. Supp. 968 (D.N.J. 1996) .........................................................................30

*Carreno v. City of Newark*,
  834 F. Supp. 2d 217 (D.N.J. 2011)..................................................................9, 30

*City of Atlantic City v. Trupos*,
  201 N.J. 447 (2010) ....................................................................................passim

*Dewey v. R.J. Reynolds Tobacco Co.*,
  109 N.J. 201 (1988) ..............................................................................22, 33, 36

*In re Enron Corp.*,
  No. 01-16034, 2002 WL 32034346 (Bankr. S.D.N.Y. 2002) .....................15, 20

*Fitzgerald v. Linnus*,
  336 N.J. Super. 458 (App. Div. 2001).................................................................10

*Ford Motor Co. v. Edgewood Props., Inc.*,
  No. 06-cv-1278, 2011 WL 5080347 (D.N.J. 2011).......................................23, 24

-ii-

*Genentech, Inc. v. Sanfi-Aventis Deutschland GMBH*,
    No. 08-cv-04909, 2010 WL 1136478 (N.D. Cal. 2010)....................................26

*In re H&S Transp. Co.*,
    53 B.R. 128 (Bankr. M.D. Tenn. 1985)..............................................................16

*H20 Plus LLC v. Arch Personal Care Prods.*,
    No. 10-cv-3089, 2010 WL 4869096 (D.N.J. 2010).............................................23

*Hooper v. Steelplank Corp.*,
    No. 80-cv-74351, 1981 WL 48163 (E.D. Mich. 1981) ......................................26

*Innovative Memory Sols., Inc. v. Micron Tech., Inc.*,
    No. 14-cv-1480, 2015 WL 2345657 at *5 (D. Del. 2015) ...........................26, 27

*Interstate Props. v. Pyramid Co. of Utica*,
    547 F. Supp. 178 (S.D.N.Y. 1982) ....................................................................16

*Kearns v. Gen. Motors Corp.*,
    94 F.3d 1553 (Fed. Cir. 1996) ...........................................................................37

*Lerner v. Laufer*,
    359 N.J. Super. 201 (App. Div. 2003) ...............................................................10

*Malico, Inc. v. Cooler Master, Inc.*,
    No. 11-cv-4537, 2013 WL 12172992 (N.D. Cal. 2013)....................................26

*Martin v. AtlantiCare*,
    No. 10-cv-6793, 2011 WL 5080255 (D.N.J. 2011).....................................26, 28

*Milwaukee Elec. Tool Corp. v. Hilti, Inc.*,
    No. 14-cv-1288, 2015 WL 1898393 (E.D. Wis. 2015) ..........................17, 21, 32

*Multimedia Patent Trust v. Apple, Inc.*,
    No. 10-cv-2618, 2011 WL 1636928 (S.D. Cal. 2011) .................................17, 19

*Openwave Sys., Inc. v. 724 Sols. (US) Inc.*,
    No. 09-cv-3511, 2010 WL 1687825 (N.D. Cal. 2010)..........................26, 27, 28

*Rohm & Hass Co. v. Am. Cyanamid Co.*,
    187 F. Supp. 2d 221 (D.N.J. 2001)....................................................................30

*Strategene v. Invitrogen Corp.*,
  225 F. Supp. 2d 608 (D. Md. 2002) ............................................................26, 27

*Strategic Envtl. Partners, LLC v. Bucco*,
  No. 13-cv-5032, 2014 WL 6065816 (D.N.J. 2014) ............................................34

*Sumitomo Corp. v. J.P. Morgan & Co., Inc.*,
  No. 99-cv-8780, 2000 WL 145747 (S.D.N.Y. 2000) ............................15, 20, 32

*Talon Research, LLC v. Toshiba Am. Elec. Components, Inc.*,
  No. 11-cv-04819, 2012 WL 601811 (N.D. Cal. 2012) ................................26, 28

*U.S. v. Jeffers*,
  520 F.2d 1256 (7th Cir. 1975) ............................................................14, 15, 20

*U.S. v. Miller*,
  624 F.2d 1198 (3d Cir. 1980) ......................................................................34, 39

*Victorinox AG v. The B&F System, Inc.*,
  200 F. Supp. 3d 423, 426 (S.D.N.Y. 2016) ......................................................38

*Wyeth v. Abbott Labs.*,
  692 F. Supp. 2d 453 (D.N.J. 2010) ....................................................9, 34, 35, 36

## RULES

*L. Civ. R.* 103.1(a) ..............................................................................................9

*RPC* 1.2(c).............................................................................................10, 21, 25

*RPC* 1.9 ...................................................................................................passim

*RPC* 1.9(a)...............................................................................................passim

*RPC* 1.10 ..........................................................................................................21

*RPC* 1.10(a)...............................................................................................28, 29, 33

*RPC* 1.10(c)................................................................................................ 28-29

## OTHER AUTHORITIES

*A.B.A. Formal Op.* 92-367 (Oct. 16, 1992) ........................................................12

*A.B.A. Formal Op.* 95-390 (Jan. 25, 1995) ...................................................... 25

*D.C. Bar Ethics Op.* 343 (Jan. 2008) ............................................... 12-14

*N.J. Adv. Comm. on Prof. Ethics* Op. 671, 133 N.J.L.J. 1370 (Apr. 5, 1993) ................................................................................................ 11, 13

*N.Y. City Ethics Committee Formal Op.* 2001-3 (July 2001) ..................... 12-13, 20

*NY State Bar Assoc. Ethics Op.* 1048 (March 3, 2015) ........................................... 12

*Restatement (Third) of the Law of Lawyering* .................................................. 11-13

*Simon's New York Rules of Professional Conduct Annotated* (2017)...................12

## I.   INTRODUCTION

Plaintiffs are attempting to manufacture a conflict where none exists, thereby depriving Defendants of the counsel of their choice.  In support of their efforts, Plaintiffs omit crucial facts that prove the error of their argument, misstate the law that applies to the current motion, and otherwise ignore key legal authority that demonstrates there is no conflict.

More than six years ago, attorneys in Fish & Richardson P.C.'s Boston office ceased representing NASDAQ in connection with certain patent prosecution matters.  NASDAQ is one of three plaintiffs in this matter.  When Defendants approached Fish and asked it to represent them in this case—specifically because the lead count in the Complaint involves a patent that Fish has already litigated against one of the named plaintiffs—Fish recognized that it could not be adverse to its former client, NASDAQ, with respect to the four patents that Fish attorneys had prosecuted years before.  Fish thus took numerous steps to avoid the NASDAQ conflict entirely.

Fish entered into a limited-scope representation with Defendants, agreeing to represent them *only* with respect to (i) the unrelated patent claims being advanced by Nasdaq ISE, LLC and FTEN, Inc. (neither of which were ever clients of Fish) and (ii) the trade secret counts, which have nothing to do with the prior patent work for NASDAQ.  Defendants hired separate conflicts counsel, Reed Smith

LLP, to handle the NASDAQ patent counts. As an added precaution, Fish established an ethical screen around the attorneys in its Boston office who had done work for NASDAQ, making doubly sure that no information from the earlier representation could affect this litigation. Since then Fish and Reed Smith have exercised extreme caution to ensure that Fish has absolutely no input or involvement with anything concerning the NASDAQ patent counts.

Limiting the scope of an attorney-client relationship is expressly permitted by New Jersey's Rules of Professional Conduct. And both courts and secondary authorities have long recognized that such limited-engagement arrangements can be used to avoid a conflict with a former client, just like Fish has done here.

The arrangement between Fish and Defendants is both permissible and workable, and Plaintiffs are wrong to allege otherwise. The ISE and FTEN patents are distinct property rights from the NASDAQ patents, with different inventors and different claims. They can, and will, be litigated without regard to the patents being asserted by NASDAQ. Indeed, the only reason the Court is even faced with this alleged "conflict" situation is because NASDAQ chose to lump its unrelated patent claims in with ISE's and FTEN's in a consolidated complaint rather than filing separate lawsuits.

Simply put, there is no ethical prohibition on Fish representing Defendants in this limited way. The motion should be denied.

## II.     FACTUAL BACKGROUND

### A.     The Prior Representation of Nasdaq, Inc.

Fish & Richardson P.C. ("Fish") is an international law firm with approximately 365 attorneys in twelve cities on two continents.  March 22, 2018 Declaration of Roger D. Feldman ("Feldman Decl."), submitted concurrently herewith, at ¶ 3.  In February 1998 Fish entered into a retainer agreement with NASDAQ Stock Market, Inc. ("NASDAQ"), by which Fish agreed to handle intellectual property matters on behalf of NASDAQ.  *Id*. at ¶ 4.  The work done by Fish for NASDAQ was largely performed out of Fish's Boston, Massachusetts, office, and the only attorneys still at Fish who worked on the NASDAQ matters are currently resident in that office.  *Id*. at ¶ 5.  All physical files relating to Fish's representation of NASDAQ were maintained in that office as well.  *Id*.

On October 12, 2011, NASDAQ informed Fish that Fish would no longer be handling NASDAQ patent work.  *Id*. at ¶ 6.  NASDAQ requested that Fish transfer its NASDAQ patent portfolio to the law firm of Nixon & Vanderhye P.C. ("Nixon").  *Id*.  Fish complied with NASDAQ's instructions, and confirmed on November 4, 2011, that the transfer had been completed.  *Id*. at ¶ 7.[1]  In accordance

---

[1] It appears that Nixon has neglected to update the USPTO filings to indicate that Fish is not the counsel of record for NASDAQ's patents.  *See* Dkt. 54-1 at 3 (observing that Fish is erroneously still listed as NASDAQ's counsel of record).

with Fish's document retention policy, Fish did not retain any copies of the physical files from NASDAQ after the representation was terminated. *Id*. at ¶ 8.

Approximately six and a half years passed between when NASDAQ terminated Fish's representation and when this motion to disqualify was filed.

### B.     The Current Litigation

On September 1, 2017, Plaintiffs filed the Complaint. Dkt. 1. Plaintiffs are three different corporate entities: Nasdaq, Inc. (for convenience, also referred to as "NASDAQ"); Nasdaq ISE, LLC ("ISE"), and FTEN, Inc. ("FTEN"). Defendants are four different corporate entities (collectively referred to as "MIAX").

Counts I and II of the Complaint are brought by ISE, and allege that MIAX has infringed two patents owned by ISE. Dkt. 1 at 17, 26. ISE has never been a client of Fish. March 23, 2018, Declaration of Michael T. Zoppo ("Zoppo Decl."), submitted concurrently herewith, at ¶ 4. To the contrary, Fish formerly represented a different party in a highly publicized suit against ISE, *CBOE v. ISE*, that resulted in the invalidation of one of the very patent claims that ISE is asserting against MIAX in the current lawsuit. *Id*. at ¶ 7. Further, ISE was not even affiliated with NASDAQ when Fish formerly represented NASDAQ. *Id*. at ¶ 9. ISE did not become a NASDAQ affiliate until approximately four years and eight months after NASDAQ terminated Fish's representation. *Id*. at ¶ 10.

-4-

Count VII of the Complaint is brought by FTEN, and alleges that MIAX has infringed an FTEN patent.  Dkt. 1 at 55.  FTEN has never been a client of Fish.  Zoppo Decl. at ¶ 4.  Indeed, the FTEN patent at issue in this suit was not issued until approximately sixteen months after NASDAQ terminated Fish.  *Id*. at ¶ 13.

Counts III through VI of the Complaint allege that MIAX infringed four separate patents owned by NASDAQ.  Dkt. 1 at 33, 37, 43, 49.  Attorneys in Fish's Boston office prosecuted those patents on behalf of NASDAQ years ago.  Zoppo Decl. at ¶¶ 14-17.

Counts VIII through X of the Complaint allege that MIAX violated certain of NASDAQ's trade secrets.  Dkt. 1 at 64, 69, 74.  Fish had no involvement with representing NASDAQ on any issue related to these alleged trade secrets.  *See* Feldman Decl. at ¶ 4.

### C.   Fish's Limited Engagement by MIAX

Upon learning that MIAX was being sued by its much larger competitor, NASDAQ, in a case seeking a billion dollars in damages, MIAX undertook a search for counsel.  March 21, 2018, Declaration of Barbara J. Comly ("Comly Decl."), submitted concurrently herewith, at ¶¶ 3-4.  MIAX discovered that Fish had extensive experience litigating patent disputes between exchanges, including in a prior lawsuit, *CBOE v. ISE*, that involved one of the very same patents that is being asserted by ISE against MIAX in the current dispute.  *Id*. at ¶¶ 5-6.  It was

because of this subject-area expertise, as well as Fish's specific experience with that ISE patent, that MIAX chose Fish to be its counsel. *Id*. at ¶ 8.

Because Fish never represented either ISE or FTEN, there is no conflict issue with Fish representing MIAX with respect to the patent claims being asserted by those two entities (Counts I, II, and VII). Similarly, because Fish's prior representation of NASDAQ was unrelated to the trade secret allegations made in the Complaint, there is no issue with Fish representing MIAX with respect to those allegations (Counts VIII-X). Indeed, NASDAQ claims a conflict over none of those issues. However, a few of Fish's current attorneys in its Boston office formerly represented NASDAQ on patent issues, including four of the patents that NASDAQ is asserting in the current case (Counts III-VI). Zoppo Decl. at ¶¶ 14-17. Fish and MIAX, therefore, entered into a limited-scope engagement to avoid the conflict issues associated with the Boston office's prior NASDAQ work.

MIAX retained Fish solely with respect to the aspects of the Complaint where Fish would not have a conflict with a former client, *i.e*., the patent claims being brought by ISE and FTEN, and the trade secret claims. Feldman Decl. at ¶ 9. MIAX retained Reed Smith LLP ("Reed Smith") as conflicts counsel to handle those aspects of the litigation relating to NASDAQ's four patents. *Id*. at ¶ 10.

Fish and Reed Smith entered into a Common Interest and Joint Representation Agreement ("JRA") to further delineate which firm was responsible

for which aspect of their dual representation of MIAX.  *Id.* at ¶ 11.  While MIAX had indicated its desire "to engage [Fish] as lead trial counsel in the above-captioned litigation," Fish made clear that it "cannot and will not represent [MIAX] with respect to the" four NASDAQ patents.  *Id.* at Ex. D.  Fish would be "lead counsel" for aspects of the case pertaining to ISE, FTEN, and the trade secrets, but "will have no input into the defense of the" four NASDAQ patents.  *Id.* The JRA further specified that there would be no "sharing of information" related to the four NASDAQ patents.  *Id.*

Reed Smith was designated as "lead counsel" for the issues relating to the four NASDAQ patents, and was afforded "complete and independent control over strategy and discovery for preparation of the defense against those Counts."  *Id.*

To further ensure that there was no possibility for the Boston office's prior work for NASDAQ to affect the litigation, Fish established a screen around the Boston office attorneys who worked on the NASDAQ patents, and ensured that no attorneys from the Boston office would be staffed on this case.  *Id.* at ¶¶ 11-15.

With the scope of Fish's representation of MIAX so limited, and with conflicts counsel in place, Reed Smith and Fish began filing their respective notices of appearance on October 18, 2017 and November 2, 2017, respectively. *See* Dkt. 7, 12.  The Fish attorneys representing MIAX are located in Fish's New York, Texas, California, and Washington, D.C., offices.  Plaintiffs consented to

Fish attorneys appearing for MIAX, agreeing to their admission to this district *pro hac vice*. Dkt. 13, 13-1, 16.

On December 4, 2017, MIAX filed a Motion to Dismiss the Complaint. Dkt. 28. The motion specified that Fish's representation of MIAX "excludes Counts III-VI." Dkt. 28 at 2; Dkt. 28-1 at 62.

On December 20, 2017, Plaintiffs' counsel sent a letter to Fish stating Plaintiffs' intent to move to disqualify Fish. Dkt. 54-12. That same day Plaintiffs' counsel asked that Reed Smith confirm that it had not received any confidential NASDAQ information from Fish. Dkt. 54-13. In both letters Plaintiffs asked for a response by January 5, 2018. Dkt. 54-12, 54-13.

Fish responded on January 5, 2018, explaining the above representation arrangements and how there was no conflict. Dkt. 54-3. Fish also observed that the timing of the objection was curious, given that Plaintiffs had consented to Fish appearing in the case approximately two months earlier when the *pro hac vice* applications were being filed, and only sought disqualification after seeing the Motion to Dismiss. *Id*. Reed Smith responded the same day, certifying that it had received no confidential NASDAQ information from Fish. Dkt. 54-11. Plaintiffs took no further action on the alleged conflict at that time.

Approximately one month went by without further communication from Plaintiffs on the alleged conflict. On January 31, 2018, Fish sent a letter to

Plaintiffs' counsel stating that there was no good faith basis for ISE's or FTEN's patent claims, or for the trade secret allegations, and further stating that MIAX reserved the right to move for attorneys' fees if such matters were not withdrawn. Dkt. 54-1 at 4 n.1.

Plaintiffs' counsel then wrote a follow-up letter on February 16, 2018, reviving its earlier arguments that there was somehow a disqualifying conflict, notwithstanding Fish's extensive efforts to remove any possibility of conflicts with a former client.  Dkt. 54-15.

Plaintiffs filed a Motion to Disqualify on March 2, 2018.  Dkt. 54.

## III.   LEGAL ARGUMENT

The New Jersey Rules of Professional Conduct ("*RPCs*") govern the conduct of attorneys appearing in the United States District Court for the District of New Jersey.  *See L. Civ. R.* 103.1(a).  "[W]hen interpreting the *RPC* Courts 'look mainly to the New Jersey state court's opinions and modify them only when federal law requires or permits.'"  *Carreno v. City of Newark*, 834 F. Supp. 2d 217, 224 (D.N.J. 2011) (quoting *Wyeth v. Abbott Labs.*, 692 F. Supp. 2d 453, 456 (D.N.J. 2010).  Accordingly, the applicable question for this motion is how would a state court interpret the *RPCs* if faced with this Motion for Disqualification.

According to Plaintiffs, "Nasdaq" (a term they leave conspicuously undefined) was formerly represented by Fish, and thus "[t]here can be no dispute

that Nasdaq is a former client of [Fish]" under *RPC* 1.9.  Dkt. 54-1 at 7.  Given the general rule that attorneys "are not allowed to argue that a patent they previously prosecuted to issuance is now invalid in a subsequent infringement action," *id*. at 2, Plaintiffs argue that Fish is therefore a "side-switching" counsel, *id*. at 1.  Plaintiffs further contend that a lawyer limiting the scope of his representation to avoid a conflict "makes no sense and has no basis in law."  *Id*. at 9.

Plaintiffs' arguments are based on a misstatement of the operative facts, a misunderstanding of the relevant law, and a misapplication of the latter to the former.

### A.    Fish is permitted to limit the scope of its representation of MIAX

The attorney-client relationship is generally "an aware, consensual relationship," one which each side takes an affirmative step to create.  Kevin H. Michels*, New Jersey Attorney Ethics* § 13:1 at 257 (2018).  For that reason, the attorney and the client are able to agree on terms defining the metes and bounds of their relationship.   Under the *RPCs* "[a] lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent."  *RPC* 1.2(c); *accord Lerner v. Laufer*, 359 N.J. Super. 201, 217 (App. Div. 2003) ("*R.P.C.* 1.2(c) expressly permits an attorney with the consent of the client after consultation to limit the scope of representation."), *certif. denied*, 177 N.J. 223 (2003); *Fitzgerald v. Linnus*, 336 N.J. Super. 458, 470 (App.

Div. 2001) ("The role of an attorney can be circumscribed by the terms of his or her engagement by the client.").

As the New Jersey Advisory Committee on Professional Ethics observed, there are "myriad . . . possible definitions of the scope of the undertaking," and such details are dealt with as "a matter of agreement between the parties." *N.J. Adv. Comm. on Prof. Ethics* Op. 671, 133 N.J.L.J. 1370 (Apr. 5, 1993).

It is a matter of black-letter law that an attorney-client relationship may be limited in scope so as to avoid potential conflicts with current or former clients. As the *Restatement (Third) of the Law of Lawyering* states, "[s]ome conflicts can be eliminated by an agreement limiting the scope of the lawyer's representation if the limitation can be given effect without rendering the remaining representation objectively inadequate." § 121 comment c(iii) (2000). Indeed, specifically in the context of *RPC* 1.9 and the duty owed to former clients, "the lawyer may limit the scope of representation to a later client so as to avoid representation substantially related to that undertaken for a previous client." *Id.* at § 132 comment e.

If the retention agreement with the second client is properly circumscribed such that it "would eliminate the conflict posed by the chance of otherwise representing [that client] in matters adverse to" another client, then "[s]uch agreement would not require the consent of" the other client. *Id.* at § 121 ill. 4. Indeed, in the absence of a "conflict," there is nothing to "consent" to. *See RPC*

1.9(a) (stating that "informed consent" from the former client waiving a conflict is only necessary if there is a conflict in the first place); *Cafaro v. HMC Int'l, LLC*, No. 07-cv-2793, 2012 WL 4857763 at *6 (D.N.J. 2012) (stating that "consent of the past client" is only required if there is a conflict under *RPC* 1.9(a)).

The *Restatement (Third)* is not alone in its recitation of this principle of black-letter law. *See, e.g.*, *Simon's New York Rules of Professional Conduct Annotated*, comment to *R.* 1.2(c) at 105 (2017) ("Limiting the scope of a representation can avoid not only malpractice liability but also conflicts of interest."); *A.B.A. Formal Op.* 92-367 at 8 (Oct. 16, 1992) (permitting a limited representation and the "retention of another lawyer" to handle a conflict situation); *D.C. Bar Ethics Op*. 343 (Jan. 2008) ("by agreeing only to represent a client as to a discrete legal issue or with respect to a discrete stage in the litigation, a lawyer may be able to limit the scope of the representation such that the new matter is not substantially related to the prior matter"); *NY State Bar Assoc. Ethics Op*. 1048 n. 9 (March 3, 2015) ("a lawyer may limit the scope of the representation with the client's informed consent, and such a limitation may serve to avoid conflicts"); *N.Y. City Ethics Committee Formal Op*. 2001-3 (July 2001) ("The scope of a lawyer's representation of a client may be limited in order to avoid a conflict that might otherwise result with a present or former client of the lawyer.").

Sometimes the limitation involves representing the client only for one discrete matter and not representing it for another, largely distinct, matter. *See, e.g.*, *Restatement (Third)* at § 132 ill. 5 (giving example where lawyer represented client for one application for regulatory approval, and declined to represent it for a second application to avoid an *RPC* 1.9 conflict). But that is by no means the universe of permissible limitations lawyers and clients may use to avoid conflicts. *See N.J. Adv. Comm. on Prof. Ethics* Op. 671 (stating that there are "myriad . . . possible definitions of the scope of the undertaking").

For instance, "[s]ubject to certain conditions, a lawyer may limit the scope of the new representation such that factual information normally obtained in the prior matter would be legally irrelevant to the advancement of the current client's position in the new matter." *D.C. Bar Ethics Op*. 343.

> In the context of litigation, a lawyer defending a client in an action who determines that there are potential cross-claims between the lawyer's client and another party also represented by the same law firm in an unrelated matter may, with the informed consent of the client whose engagement is being limited, limit her engagement to the defense of the case, and exclude representation of the client against the other client.

*Id.* In such instances, "new counsel" would be hired to represent those discrete issues on behalf of the client in that same litigation. *Id.*

There are many other examples. *See, e.g.*, *N.Y. City Bar Association, Professional Ethics Committee* Formal Op. 2001-3 (July 2001) (if a lawyer would

be required to issue a subpoena to a client as part of its litigation representation of a different client, "separate counsel may be brought in for the purpose of issuing the subpoena and taking discovery from the non-party client"); *A.B.A. Formal Op.* 92-367 at 8 (if during trial a witness takes that stand who is a former client of the lawyer, "a satisfactory solution may be the retention of another lawyer solely for the purpose of examining the principal lawyer's client"); *D.C. Bar Ethics Op*. 343 (if there are multiple discrete issues in a single litigation, the client may hire two "wholly separate litigation teams" to handle those issues). Thus, it would be permissible for a client to hire a lawyer "to represent it as to a discrete legal issue as part of a larger legal representation whose interests are adverse to the lawyer's former client, where the specific legal issue is one that is entirely distinct from the matter in which the lawyer (or the lawyer's law firm) had previously represented a former client." *D.C. Bar Ethics Op*. 343.

The *Restatement (Third)* and the above secondary sources are not alone in these pronouncements of the law. Many courts are in accord.

For example, the Seventh Circuit has long held that if a witness takes the stand during a trial where the primary lawyer would have a conflict, then the proper course is to hire "additional counsel" to handle that discrete aspect of the single litigation. *See U.S. v. Jeffers*, 520 F.2d 1256, 1266 (7th Cir. 1975), *cert.*

-14-

*denied*, 423 U.S. 1066 (1976).  The presence of a conflict for that discrete issue is not disabling if conflicts counsel is used.  *Id.*

A more recent example from the Southern District of New York involved an attorney and client that "agreed to limit the scope of [the lawyer's] employment in this case to eliminate the possibility of conflicts with former clients."  *In re Enron Corp.*, No. 01-16034, 2002 WL 32034346 at *10 (Bankr. S.D.N.Y. 2002), *aff'd*, No. 02-cv-5638, 2003 WL 223455 (S.D.N.Y. 2003).  "Instead, these functions [related to former clients] will be assumed by [the second law firm], conflicts counsel."  *Id.*  The court held this procedure permissible.  *Id.* at *11-12.  "Conflicts counsel, limited engagement agreements, and ethical walls have been acceptable procedures to address conflict of interests issues."  *Id.* at *11.

Yet another example is *Sumitomo Corp. v. J.P. Morgan & Co., Inc.*, No. 99-cv-8780, 2000 WL 145747 (S.D.N.Y. 2000).  There the plaintiff had various related claims against various companies based on its investment losses.  *Id.* at *1.  The plaintiff's counsel agreed to represent that client for some of the claims, but separate counsel was retained to litigate claims against one of the defendants where there was a conflict.  *Id.* at *1-2.  Even after the two litigations were ultimately consolidated, the court found that disqualification was not warranted.  *Id.* at *4-5.  Within that consolidated matter, the law firm was not representing any claims against its other client—conflicts counsel was.  *Id.*

In *Buysse v. Baumann-Furrie & Co.*, 448 N.W.2d 865, 867-68 (Minn. 1989), Minnesota's highest court addressed a situation where there were two discrete legal issues in a single litigation: (i) whether a particular settlement was enforceable against an insurance company and (ii) if it was enforceable, what amount the insurance company should be required to pay. The insurer moved to disqualify the adverse law firm handling the case because the insurer was a concurrent client of that firm in other matters. *Id*. at 868. The firm responded that the lawyer handling the instant matter was from a separate office from the office that represented the insurer, and that he had not been privy to any information from that other office's representation of the insurer. *Id*. at 868-69. Moreover, the firm limited its representation to the first legal issue (where it was determined there was no conflict) and not the second; "independent counsel" was responsible for the second legal issue. *Id*. at 868. The court determined that, under those circumstances, disqualification was not warranted. *Id*. at 869.

There are numerous other examples. *See, e.g.*, *Interstate Props. v. Pyramid Co. of Utica*, 547 F. Supp. 178, 181 (S.D.N.Y. 1982) (finding that the law firm properly "circumscribed its relationship with" client A "to remove the possibility of conflict" with client B); *In re H&S Transp. Co.*, 53 B.R. 128, 133 (Bankr. M.D. Tenn. 1985) (in a bankruptcy case, holding that an attorney who "represented the trustee in a limited capacity[] avoided any conflict of interest"); *see also*

-16-

*Milwaukee Elec. Tool Corp. v. Hilti, Inc.*, No. 14-cv-1288, 2015 WL 1898393, at*1, 6 n.10, 7 (E.D. Wis. 2015) (in related patent cases coordinated for discovery purposes, permitting use of conflicts counsel in one litigation to avoid a current-client-conflict); *Multimedia Patent Trust v. Apple, Inc.*, No. 10-cv-2618, 2011 WL 1636928 at *1 (S.D. Cal. 2011) (permitting use of conflicts counsel to avoid a current-client-conflict in related patent litigations).

Plaintiffs are thus mistaken when they boldly claim that there is "no basis in law" for limiting a representation so as to avoid a conflict.  Dkt. 54-1 at 9.  It has been done time and time again, and is adjudged proper by courts and numerous secondary sources all over the country, including the *Restatement (Third)* itself.

As a fallback argument, Plaintiffs assert that limiting the scope of the representation to avoid a conflict "is not workable in practice," and should therefore be disallowed.  *Id.* at 10.  They conjure up a list of hypotheticals and hyperboles, claiming that they somehow should be used to trump MIAX's choice of counsel in this matter.  *Id.* at 10-11.  None have merit.

To begin, Plaintiffs observe that Reed Smith—conflicts counsel, against whom Plaintiffs allege no conflicts—filed a Motion to Dismiss brief to which Fish contributed.  *Id.* at 10.  Plaintiffs claim that because it is "impossible to verify" who worked on which aspects of the brief, disqualification must be appropriate. *Id.*  The argument is misplaced.  Fish's principal attorney on this matter has

submitted a declaration explaining how the Motion to Dismiss was constructed, making it clear that Fish in no way contributed to any argument or issue concerning any of the NASDAQ patents.[2]  Zoppo Decl. at ¶¶ 23-25.  Moreover, the arguments in the Motion to Dismiss are threshold patentability issues arising out of the record of the patents themselves and have nothing to do with any alleged NASDAQ "confidences."   Dkt. 65 at 3.   And as for the claim that NASDAQ "cannot be assured" that the Fish attorneys who worked on the prior NASDAQ matters six years ago are properly "quarantined," Dkt. 54-1 at 10, eight Fish attorneys, as well as a Reed Smith attorney, have submitted declarations concurrent with this filing that should be more than sufficient to set NASDAQ at ease.

Not only has Fish refused to represent MIAX for any issues relating to the Boston office's prior representation of NASDAQ, but Fish has ethically screened the Boston office attorneys out of an abundance of caution.  Indeed, even within the Boston office, Fish did not retain any copies of the physical files from NASDAQ after the representation was terminated more than six years ago.  Thus both belt and suspenders are in place to ensure that Fish "is not using the

_____

[2] Even if the Court would have preferred that separate briefs be filed, that is certainly something that can be done in the future, but which presents no basis for disqualification now.  *See Buysse*, 448 N.W. 2d at 869 (commenting that while "separate briefs" would have been preferable where two law firms were handling two legal issues in one case, not ordering disqualification).

confidences it gained from [NASDAQ]" during its defense against the ISE and FTEN patents. *See* Dkt. 54-1 at 10.

Plaintiffs are similarly mistaken in their claim, made in their March 23, 2018, correspondence, that the handling of the March 20 telephone conference somehow justifies disqualification. *See* Dkt. 66 at 2. As the Court is aware, on the March 20 call a Fish attorney observed that if the Motion to Dismiss was resolved in MIAX's favor, it would moot the Motion to Disqualify. Contrary to Plaintiffs' strained arguments, that procedural observation is hardly akin to Fish's "arguing during the telephone conference that [the NASDAQ] patents were invalid." *Id.* The statement was a matter of common sense that has nothing to do with the merits of the Motion to Dismiss, let alone any alleged NASDAQ confidences.

In their disqualification motion Plaintiffs offer various other examples of why the use of Reed Smith as conflicts counsel is allegedly "not workable." They claim that Plaintiffs' "validity and infringement experts [would be required] to submit to deposition questioning by multiple lawyers," and that there might be multiple cross examinations at trial. *Id.* at 10-11. But the inventors of the ISE and FTEN patents are wholly distinct from the inventors of the NASDAQ patents; the testimony of one will have no meaningful effect on the testimony of another. Zoppo Decl. at ¶ 20. And there is no legitimate reason why the expert testimony on one patent would materially affect the expert testimony on another patent; each

is a distinct matter than can, and should, be properly cabined off from another.  *Id.* at ¶¶ 21-22.  Even if there were some minimal overlap between these disparate patents, requiring a witness to submit to two sets of questioning for that limited overlap is hardly unjust.  Indeed, it would have been the prerogative of the four defendants in this lawsuit each to have hired independent counsel, with each counsel asking their own questions at any deposition or trial.  Surely, the prospect of a witness being asked a few extra questions is insufficient to override the clients' right to the attorney (or attorneys) of their choosing.

Contrary to Plaintiffs' suggestions, the representation arrangement will not present any significant obstacles to discovery or trial as this matter progresses. None of the authorities permitting the use of conflicts counsel have stated that the conflicted attorney must absent himself during the discussion of matters where he is conflicted.  To the contrary, they merely state that conflicts counsel must handle the issue without any substantive input from the conflicted attorney.  *See, e.g.*, *Jeffers*, 520 F.2d at 1266; *Buysse*, 448 N.W.2d at 868-69; *In re Enron*, 2002 WL 32034346 at *11; *Sumitomo Corp.*, 2000 WL 145747 at *4-5; *A.B.A. Formal Op.* 92-367 at 8; *N.Y. City Ethics Committee* Formal Op. 2001-3.  Thus, for example, while Fish may not submit any discovery requests that relate to the NASDAQ patents, it may receive a copy of any discovery responses given to Reed Smith. Fish likewise may not cross-examine Plaintiffs' expert on issues related to the

NASDAQ patents at trial, but Fish would not be required to leave the courtroom if Reed Smith chooses to do so.

Simply put, Fish has taken appropriate measures under *RPC* 1.2(c) to ensure that there can be no conflict with its former client, NASDAQ.  Fish has limited its patent-related representation of MIAX to the ISE and FTEN patents, and has walled off the office where the NASDAQ work was done over six years ago.  It is not possible for the earlier NASDAQ representation to affect this case.  Because there is no conflict with NASDAQ, NASDAQ's consent to the MIAX representation was not required.  And to the limited extent that the inclusion of two firms *might* present logistical issues down the road, those are certainly issues that can be addressed at that time.   Unfounded hypotheticals cannot be used to disqualify MIAX's counsel of choice.  *See Milwaukee Elec. Tool Corp.*, 2015 WL 1898393 at \*5 (finding that "logistical issues of future depositions" were "speculative at best," and not ordering disqualification).

### B.     Plaintiffs cannot carry their burden to justify disqualification

Plaintiffs allege that the entire Fish firm (and not just the attorneys in Fish's Boston office) must be disqualified from this case by virtue of *RPC* 1.9 and *RPC* 1.10.  Dkt. 54-1 at 5-6.  They are mistaken.

The *RPCs* state, "A lawyer who has represented a client in a matter shall not thereafter represent another client in the <u>same or a substantially related matter</u> in

which that client's interests are <u>materially adverse</u> to the interests of the <u>former</u> <u>client</u> unless the former client gives informed consent confirmed in writing." *RPC* 1.9(a) (emphasis added).   Thus there are "three necessary predicates to the application of *R.P.C.* 1.9(a)'s disqualification bar." *City of Atlantic City v. Trupos*, 201 N.J. 447, 463 (2010).  First, the law firm must have "formerly represented" the entity asserting disqualification.  *Id*.   Second, the subsequent matter must be "materially adverse" to the interests of that former client.  *Id*.   Third, the two matters must be the "same or substantially related." *Id*. at 464.

When an *RPC* 1.9(a) motion is filed, there is a burden shifting.  "[T]he initial burden of production—that the lawyer(s) for whom disqualification is sought formerly represented their present adverse party and that the present litigation is materially adverse to the former client—must be borne by the party seeking disqualification." *Id*. at 462 (citing *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 221-22 (1988)).  "If that burden of production or of going-forward is met, the burden shifts to the attorney(s) sought to be disqualified to demonstrate that the matter or matters in which he or they represented the former client are not the same or substantially related to the controversy in which the disqualification motion is brought." *Id.* at 462-63.  "That said, the burden of persuasion on all elements under *R.P.C.* 1.9(a) remains with the moving party, as it bears the burden of proving that disqualification is justified." *Id*. at 463 (quotation omitted); *accord*

*H20 Plus LLC v. Arch Personal Care Prods.*, No. 10-cv-3089, 2010 WL 4869096 at *4 (D.N.J. 2010) ("The party seeking disqualification must carry a heavy burden and must meet a high standard of proof before a lawyer is disqualified.").

The interests of MIAX are "materially adverse" to those of ISE, FTEN, and NASDAQ: they are opposing parties in the same litigation.  But Plaintiffs cannot carry—indeed, in many instances, have not even tried to carry—their burden over the other two essential elements of the *Trupos* test.  Because the burden is not met, disqualification must be denied.

### i.      Neither ISE nor FTEN are "former clients" of Fish

As already stated, a necessary prerequisite for disqualification under *RPC* 1.9(a) is that the entity was actually "a past client whom the lawyer 'represented' in a matter."  *Cafaro*, 2012 WL 4857763 at *6; *accord Trupos*, 201 N.J. at 463 (that "the law firm formerly represented plaintiff" is a "necessary predicate[]"); *H20 Plus*, 2010 WL 4869096 at *5 ("the existence of a past attorney client relationship" is required); *Ford Motor Co. v. Edgewood Props., Inc.*, No. 06-cv-1278, 2011 WL 5080347 at *3 (D.N.J. 2011) (*RPC* "1.9(a) applies only if the moving party meets its burden of showing . . . the moving party is a former client of the adverse party's attorney").

In deciding whether moving parties were "'former clients' under 1.9, the Court looks to whether [the lawyer] had an attorney-client relationship with each

-23-

entity." *Ford Motor Co.*, 2011 WL 5080347 at *4.  If that initial burden of proving the attorney-client relationship is not met, then the inquiry ceases.  *See, e.g.*, *Trupos*, 201 N.J. at 467 (denying disqualification where moving party failed to meet its burden).

Plaintiffs have made no effort to demonstrate that an attorney-client relationship ever existed between Fish and either ISE or FTEN.  Instead, they loosely use the name "Nasdaq" throughout their moving papers, conspicuously leaving that term undefined to blur any distinction between the plaintiffs.[3]  Using that elision, they then proceed to make numerous false accusations about who represented whom and what import that has for this motion.  *See, e.g.*, Dkt. 54-1 at 9 ("The issue is simple: the [Fish] Attorneys prosecuted patents for Nasdaq in one 'matter,' and [Fish] now represents MIAX against these same patents in another 'matter.'").  This clumsy attempt at sophistry is unavailing.

Neither ISE nor FTEN were ever "clients" of Fish.  To the contrary, Fish was adverse to ISE for ten years in the earlier ISE patent litigation, and ISE did not even become a NASDAQ affiliate until approximately four years and eight months *after* NASDAQ terminated Fish's representation.  Likewise, FTEN's patent was not issued until approximately one year and four months *after* NASDAQ cut ties

---

[3] *Compare, e.g.*, Dkt. 54-1 at 3 (stating that "Nasdaq asserts seven patents," leading one to believe that "Nasdaq" is synonymous with all three plaintiffs); *with id.* at 2 (referring to "Nasdaq" as the entity that hired Fish in 1998, leading one to believe that "Nasdaq" excludes ISE and FTEN).

with Fish, and Fish never represented FTEN.  Accordingly, even if Plaintiffs had attempted to carry their burden of production in this matter—and again, they did not—they would have failed to establish that either ISE or FTEN were Fish's "clients."  *Cf. Michels* § 19:2-1(c) at 421 ("[A] corporate affiliate of the law firm's client is properly deemed a client of the firm for conflict purposes only if an attorney-client relationship can be said to have arisen either by express agreement or by implication from the facts and circumstances."); *id.* at 419 (stating that a lawyer can be adverse to a client's affiliate in an unrelated matter unless there was an attorney-client relationship with that affiliate or other binding agreement limiting the lawyer's ability to handle that matter); *A.B.A. Formal Op.* 95-390 at 2 (Jan. 25, 1995) ("The fact of corporate affiliation, without more, does not make all of a corporate client's affiliates into clients as well.").[4]

Here, Fish has taken appropriate measures under *RPC* 1.2(c) to ensure that it is not adverse to NASDAQ.  While Fish is adverse to ISE and FTEN, neither of them were formerly "clients" of Fish.

Thus the proper question in this case is simply stated: Is a law firm ethically precluded from challenging the validity of an entity's patent when the entity is not itself a former client, but rather only the *affiliate* of a former client?  Under the

---

[4] Any allegation that NASDAQ might be adversely affected by a litigation against one of its affiliates would be irrelevant for conflicts purposes.  *See ABA Formal Op.* 95-390 at 10 ("The fact that the parent might be indirectly affected by a judgment against its subsidiary is not sufficient.").

plain language of *RPC* 1.9(a), the answer is clearly no.   Plaintiffs have not presented a single case to suggest otherwise.   Indeed, the cases that Plaintiffs do cite, Dkt. 54-1 at 8-14 are all distinguishable at the most basic of levels, and thus carry no weight.

Every single case Plaintiffs cite involved a situation where the lawyer at one time represented a client in a matter, and then either the lawyer or his firm sought to be adverse to that *very same client* in either the same or subsequent matter.   *See, e.g.*, *Asyst Tech., Inc. v. Empak, Inc.*, 962 F. Supp. 1241, 1241 (N.D. Cal. 1997); *Strategene v. Invitrogen Corp.*, 225 F. Supp. 2d 608, 609 (D. Md. 2002); *Atasi Corp. v. Seagate Tech.*, 847 F.2d 826, 828 (Fed. Cir. 1988); *Audio MPEG, Inc. v. Dell, Inc.*, 219 F. Supp. 3d 563, 574 (E.D. Va. 2016); *Innovative Memory Sols., Inc. v. Micron Tech., Inc.*, No. 14-cv-1480, 2015 WL 2345657 at *5 (D. Del. 2015); *Genentech, Inc. v. Sanfi-Aventis Deutschland GMBH*, No. 08-cv-04909, 2010 WL 1136478 at *1 (N.D. Cal. 2010); *Malico, Inc. v. Cooler Master, Inc.*, No. 11-cv-4537, 2013 WL 12172992 at *1 (N.D. Cal. 2013); *Talon Research, LLC v. Toshiba Am. Elec. Components, Inc.*, No. 11-cv-04819, 2012 WL 601811 at *1, 5 (N.D. Cal. 2012); *Openwave Sys., Inc. v. 724 Sols. (US) Inc.*, No. 09-cv-3511, 2010 WL 1687825 at *4 (N.D. Cal. 2010); *Hooper v. Steelplank Corp.*, No. 80-cv-74351, 1981 WL 48163 at *1 (E.D. Mich. 1981); *Martin v. AtlantiCare*, No. 10-cv-6793, 2011 WL 5080255 at *1 (D.N.J. 2011).   That is not what is happening

here.  Fish has avoided any possibility of being adverse to its former client, NASDAQ, on any matters related to it past work for NASDAQ.  It is adverse to NASDAQ's affiliates only.

Apart from being fundamentally distinguishable (and thus irrelevant), Plaintiffs' cases present other flaws, too.  For instance, many of them rely on the "appearance of impropriety" standard as part of their analysis.  *See, e.g.*, *Asyst Tech.*, 962 F. Supp. at 1243; *Strategene*, 225 F. Supp. 2d at 610; *Innovative Memory Sols.*, 2015 WL 2345657 at *1.  New Jersey abandoned that standard in 2004, and there are thus "questions about the fate of the numerous cases" that relied on that doctrine.  *See Michels* § 18:2 at 397.

In addition, Plaintiffs misstate what one of their (irrelevant) cases actually held.  Plaintiffs claim that *Openwave* "disqualif[ied] defendant's firm who worked on ten patent prosecution matters for plaintiff which resulted in the issuance of two patents relating to the same general technological area as the asserted patents." Dkt. 54-1 at 12.  *Openwave* held no such thing.  To the contrary, the court there held that a patent "simply occupying the same general technological field" is insufficient to show a conflict, even when the entity actually is a former client of the law firm.  *Openwave Sys.*, 2010 WL 1687825 at *3.  Indeed, the court specifically rejected the disqualification motion on the basis of the prior prosecution work, holding that the former client "has simply failed to show as a

factual matter that the technological subject matter of the prior [patent prosecution] representation" was relevant in the new matter. *Id*.

Plaintiffs also overstate the holding of another one of their (irrelevant) cases. They seem to claim that *Talon* held that when "patents that share the same USPTO class as the asserted patents" are at issue, disqualification is required. Dkt. 54-1 at 12. But the *Talon* court actually held that "the PTO classification system is not dispositive," but rather only a factor to consider in deciding if there is a sufficient "overlap" between subject matters. *Talon Research*, 2012 WL 601811 at *5-6. But in any event, such questions of "overlap" are irrelevant if the alleged "former client" was not actually a client of the law firm in the first place.

Lastly, Plaintiffs rely on *Martin* for the proposition that Fish was required to "produce a written screening policy" to NASDAQ before it represented MIAX. Dkt. 54-1 at 13-14. *Martin* involved an attorney who did extensive work on behalf of the defendants at one law firm, and then switched to the plaintiffs' law firm while the case was still pending. 2011 WL 5080255 at *1. Accordingly, *Martin* involved the classic "side-switching attorney" who makes a lateral move to a new firm, and the corresponding rules under *RPC* 1.10(c) to determine whether the conflict must be imputed to the firm. It had nothing to do with *RPC* 1.10(a). *Compare id.* at *3 (stating that the case was governed by *RPC* 1.10(c)); *with* Dkt. 54-1 at 6, 13 (mistakenly claiming that *Martin* analyzed *RPC* 1.10(a)). Neither

*RPC* 1.10(c)'s nor *Martin*'s requirement on "written notice" to former clients have any bearing in an *RPC* 1.10(a) scenario.

The *sine qua non* of an *RPC* 1.9(a) disqualification motion is that the attorney is trying to be adverse to a "former client."  There is no such adversity here over any of the patent issues.  For that reason alone, Plaintiffs' motion must fail with respect to those patent issues.

### ii.      The various matters are not "substantially related"

While Fish is not adverse to NASDAQ for any of the NASDAQ patent issues, Fish is adverse to NASDAQ with respect to the trade secret issues. Plaintiffs appropriately do not claim that the adversity to NASDAQ on those matters are disqualifying under *RPC* 1.9(a), because they clearly are not.

When an attorney seeks to be materially adverse to a former client, there will be a conflict only if the current matter is the "same or substantially related" to the prior representation of that former client.  *RPC* 1.9(a).  Matters are "substantially related" if either of two factors is met: (1) "the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client," or (2) "facts relevant to the prior representation are both relevant and material to the subsequent representation."  *Trupos*, 201 N.J. at 467.   The determination is necessarily "a fact-sensitive analysis to ensure that the congruity

of facts, and not merely similar legal theories, governs whether an attorney ethically may act adverse to a former client." *Id.*

Under the first factor, if the former client "can point to no confidential communication it shared with the law firm that could have been or might be used against it in the" subsequent matter, then the matters are not "substantially related." *Id.* at 469. "[S]urmise alone cannot support an order of disqualification." *Id.* Under the second factor, a "purely superficial similarity" is insufficient. *Id.* Instead, the former client must carry its burden in demonstrating that "the facts of the prior representation . . . are relevant or material to the" new matter. *Id.*

"[W]hether the matters are the same or substantially related must be based on fact . . . ." *Id.* at 464. Accordingly, "*Trupos* requires that this Court make a factual reconstruction of the scope of the prior legal representation." *Carreno*, 834 F. Supp. 2d at 221 n.2; *accord Michels* § 21:4 at 549 ("the substantial-relationship inquiry turns ultimately on a close examination of the particulars").[5]

---

[5] Attempting to define "substantially related," Plaintiffs cite to numerous pre-*Trupos* cases that were decided when New Jersey still adhered to the "appearance of impropriety" standard. *See* Dkt. 54-1 at 12-13 (citing *Cardona v. General Motors Corp.*, 942 F. Supp. 968, 973 (D.N.J. 1996)); *id.* at 7-8 (citing *Rohm & Hass Co. v. Am. Cyanamid Co.*, 187 F. Supp. 2d 221, 228 (D.N.J. 2001)). While "cases preceding the 2004 amendments to the RPC's have touched on what constitutes 'same or substantially related matters,' each has been influenced heavily by the now-rejected appearance of impropriety standard." *Trupos*, 201 N.J. at 464. Caution is therefore warranted before relying on any of Plaintiffs' pre-*Trupos* cases that purport to define "substantially related." *See Michels* § 21:4 at 551-52 (stating that "the pre-RPC cases and opinions applying the 'substantial

Application of these principles to this matter is straightforward. Fish formerly prosecuted certain patents on behalf of NASDAQ. Now, Fish seeks to be adverse to NASDAQ with respect to certain trade secret allegations, i.e., that various former NASDAQ employees delivered trade secrets to MIAX. *See* Dkt. 1 at 2-3. Plaintiffs have made no claim that these matters are "substantially related," because they clearly are not. Whatever confidential information the attorneys in Fish's Boston office (who are screened anyway) could have learned about NASDAQ's patent strategies would be useless in this trade secret action. The underlying facts between the patents and the trade secrets are wholly distinct. *Cf. Michels* § 21:4 at 554 (doubting "whether an attorney's knowledge of general information about the litigation and settlement philosophy of a former client, without more, would be sufficient to warrant a finding that a current matter is substantially related to a matter or matters handled for that client in the past"; "'the matters themselves—the cases—must be substantially related'"). Thus there is no issue with Fish being adverse to NASDAQ over the trade secret issues.

Even if the Court were inclined to apply the "substantially related" test to the ISE and FTEN patent issues (which would be inappropriate, since neither ISE nor FTEN are "former clients") there still would be no conflict. Under the first *Trupos*

relationship'" test are still relevant only "to the extent that their analysis[] focuses on the factors ultimately distilled in the *Trupos* standard[] and is not expressly or implicitly guided by appearance or 'public perception' concerns").

prong whatever confidential information the attorneys in the Boston office might have learned from NASDAQ more than six years ago would not assist in the defense against the FTEN and ISE patents.  And the fact that some of the positions taken by Fish with respect to the ISE and FTEN patents might indirectly impact NASDAQ's interests in this matter is also irrelevant.  *See Milwaukee Elec. Tool Corp.*, 2015 WL 1898393 at *6 (that law firm might make "arguments on behalf of the [second client] with respect to patent validity that are contrary to the views of [the first client]" is irrelevant, because such arguments "relat[e] to the circumstances of the [new client's] patents" and are "independent of the specific circumstances of [the first client]"); *Sumitomo Corp.*, 2000 WL 145747 at *4 ("While one can understand that [the first client's] in-house counsel might be unhappy that a law firm which represents it in some matters was taking a position in litigation involving another client that, if adopted, would prejudice an argument that [the first client] was advancing in a separate case, that does not mean that the law firm is violating a confidence of its client or engaging in unethical conduct.").

Similarly, the facts learned in the NASDAQ representations will have no bearing on the litigation of the ISE and FTEN patents, thus defeating the second *Trupos* prong.  Plaintiffs' half-hearted arguments that the ISE and FTEN patents are "substantially related" to the NASDAQ patents because they "share the same subject matter," Dkt. 54-1 at 11, is an illogical argument that ignores the elements

of the *Trupos* test.  Indeed, by Plaintiffs' rationale, Fish would not have been allowed to litigate the *CBOE v. ISE* case—or indeed, any other case involving exchange patents—merely because Fish at one time represented NASDAQ, and the NASDAQ patents "share[d] the same subject matter" as the patent at issue in that litigation.  That is not the standard.

Plaintiffs have failed to carry their burden of persuasion that Fish is now adverse to a "former client" in a matter that is the "same or substantially related" to the NASDAQ patent representations.  There is no conflict.

### iii.    Imputation of any alleged conflict to Fish is inappropriate

Because there is no conflict under *RPC* 1.9(a), there is nothing to impute to the entire Fish law firm under *RPC* 1.10(a).  *See RPC* 1.10(a) (imputing conflicts only if an attorney "practicing alone would be prohibited" from the representation under *RPC* 1.9); *see, e.g.*, *Dewey*, 109 N.J. at 212 (treating the existence of an *RPC* 1.9(a) conflict as a prerequisite to any *RPC* 1.10(a) imputation analysis).  Accordingly, the arguments advanced by Plaintiffs on imputation, Dkt. 54-1 at 13-15, are mistaken.

### C.    Even if there were a conflict, disqualification is inappropriate

As already demonstrated, Fish's limited-scope representation of MIAX presents no conflicts.  The analysis should cease.  But, even if the Court were to

believe that there were some technical conflict of interest under the *RPCs*, then disqualification still would not be appropriate.

Even when there is a violation of the *RPCs*, "disqualification is never automatic." *U.S. v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980) (quotation and citations omitted). Instead, "the court should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule. It should consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." *Id.*; *accord Strategic Envtl. Partners, LLC v. Bucco*, No. 13-cv-5032, 2014 WL 6065816 at *2 (D.N.J. 2014) ("a court's finding that a violation of the *RPC*'s has occurred does not result in automatic disqualification"); *Cafaro*, 2012 WL 4857763 at *7 (same).

The question is essentially a balance, with the "client's right to freely choose his counsel" on one side of the scale, and "the need to maintain the highest standards of the legal profession" on the other. *Strategic Envtl. Partners*, 2014 WL 6065816 at *2. In this district "motions to disqualify are viewed with disfavor and disqualification is considered a drastic measure which courts should hesitate to impose except when absolutely necessary." *Wyeth*, 692 F. Supp. 2d at 457. This is particularly true in patent cases, which are "more likely to involve intensely

-34-

complex, specialized issues that require experienced, knowledgeable counsel, and mandatory disqualification may work prejudice to a party by depriving it of its counsel of choice." *Id*. at 458. "[A] court must exercise extreme caution not to act under the misguided belief that disqualification raises the standard of legal ethics and the public's respect; the opposition effect is just as likely—encouragement of vexatious tactics, which increases public cynicism about the administration of justice." *Id*. at 458-59 (quotation omitted).

Accordingly, even when a technical conflict exists, courts must apply a "balanced approach" that looks to "the totality of the circumstances." *Id*. at 457. In *Wyeth*, the District Court identified twelve factors that should inform the analysis: "(1) prejudice to [the former client]; (2) prejudice to [the new client]; (3) whether [the law firm's] representation of [the former client] in the [former] matter has allowed [the new client] access to any confidential information relevant to this case; (4) the cost—in terms of both time and money—for [the new client] to retain new counsel; (5) the complexity of the issues in the case and the time it would take new counsel to acquaint themselves with the facts and issues; (6) which party, if either, was responsible for creating the conflict"; (7) "whether the two matters at issue are related in substance"; (8) "whether both matters are presently active"; (9) "whether any attorneys from the firm have been involved in both matters"; (10) "whether the matters are each being handled from offices in different geographic

locations"; (11) "whether the attorneys from the law firm work with different client representatives for each matter"; and (12) "the relative time billed by the law firm to each matter." *Id*. at 459.

Each of these factors favors respecting MIAX's choice of counsel. First, there is no "prejudice" to NASDAQ, since Fish has taken appropriate steps to ensure that the different office's unrelated representation from over six years ago cannot influence this litigation. Second, there would be "prejudice" to MIAX, since there are very few firms that have any litigation experience between options exchanges, and one of the main reasons MIAX chose Fish was because of Fish's decade-long experience litigating the *CBOE v. ISE* matter. Comly Decl. at ¶¶ 4-6. Requiring any counsel, including Reed Smith, to learn the history of those ten years of litigation would be an unnecessarily cumbersome and expensive task.[6]

Third, there can be no assertion that MIAX has been allowed "access to any confidential information relevant to this case" based on the earlier NASDAQ representation. MIAX's limited engagement of Fish was designed to make all such information irrelevant, and the attorneys in the Boston office have been screened as

---

[6] It would not be unreasonable for one to question whether the Motion to Disqualify was motivated by a desire to put MIAX precisely in that strategic disadvantage. *See Wyeth*, 692 F. Supp. 2d at 459 (stating that courts must be wary of "vexatious tactics" in disqualification motions); *Dewey*, 109 N.J. at 218 ("disqualification motions are often made for tactical reasons"); *see also* Comly Decl. at ¶ 6 (noting that ISE was ordered to pay over six million dollars in Fish's attorneys' fees in the previous litigation).

an added precaution.  Fourth, the "cost . . . to retain new counsel" is substantial, given that new counsel would need to learn a decade of *CBOE v. ISE* litigation history in order to attempt replacing Fish in this matter.  For like reasons, the fifth factor also counsels against disqualification, since "the time it would take new counsel to acquaint themselves with the facts and issues" of the *CBOE v. ISE* litigation is substantial.

Six, it is clear that NASDAQ—and not MIAX—was "responsible for creating the [alleged] conflict."  There is no legal reason why the ISE and FTEN patents needed to be pled in the same complaint as the NASDAQ patents.  Each is a distinct claim from a distinct party that rises and falls without assistance from the other patent claims.  *See Kearns v. Gen. Motors Corp.*, 94 F.3d 1553, 1554-55 (Fed. Cir. 1996) ("By statutory and common law, each patent establishes an independent and distinct property right. . . . [I]nfringement of one patent is not a ground of liability for infringement of a different patent . . . ." (citations omitted)), *cert. denied*, 520 U.S. 1186 (1997); *id.* at 1556 ("each patent, by law, covers a[n] independent and distinct invention" and "infringement must be separately proved as to each patent").  Had NASDAQ not combined three plaintiffs, seven patents, and three trade secret causes of action into a single complaint, none of these issues would have ever arisen.

Seventh, the ISE and FTEN patent issues are not "related in substance" to the NASDAQ patent issues, as already explained.  Eighth, the NASDAQ patent representations have not been "presently active" for over six years.  Indeed, one of the patent applications for the subject NASDAQ patents was filed in 1998 (almost *twenty* years ago) and even the most recent issuance of a subject NASDAQ patent was in 2011 (almost *seven* years ago).  Ninth, there are no Fish attorneys who have been involved in both matters—the Boston office screen has ensured that.

Relatedly, the tenth factor also disfavors disqualification, since the two matters were each "handled from offices in different geographic locations."  The earlier NASDAQ representations were handled by Fish lawyers who are now based exclusively in the Boston office, around whom there is currently a screen.  The current MIAX representation is being handled out of the New York, Texas, California, and Washington D.C. offices.  Such geographic distance between the offices even further justifies no imputation or disqualification.  *See, e.g.*, *Victorinox AG v. The B&F System, Inc.*, 200 F. Supp. 3d 423, 426 (S.D.N.Y. 2016) (deciding not to impute conflict from firm's Texas office to firm's New York office where no information had been shared), *aff'd*, 709 Fed. Appx. 44 (2d Cir. 2018); *California Self-Insurers' Sec. Fund v. Superior Court of Orange Cty.*, 228 Cal. Rptr. 3d 546, 555-56 (Cal. App. Div. 2018) (deciding not to impute conflict from firm's Los Angeles office to firm's San Francisco office where no

information had been shared); *see also id.* at 556 (in light of modern "mega-firm" trend of law firms "opening branch offices nationwide or internationally," the "modern rule" should focus on "[i]ndividual assessment of the facts rather than automatic disqualification" based on imputation).

Eleventh, Plaintiffs have presented no evidence that the "client representatives" from the earlier NASDAQ representation will somehow be relevant in this new litigation. And finally, twelfth, "the relative time billed by the law firm to each matter" also counsels against disqualification. The amounts of hours billed on the four NASDAQ patent matters were, respectively, 62.0, 131.88, 138.6, and 158.91. Feldman Decl. at ¶ 20. The number of hours billed by Fish in this litigation is already in excess of 1,850, almost four times the total hours billed for all four NASDAQ patents combined. *Id.* at ¶ 21.

Apart from the factors, disqualification is unwarranted on the most fundamental level given "the ends that the disciplinary rule is designed to serve." *Miller*, 624 F.2d at 1201. As evidenced by the *Trupos* standard, *RPC* 1.9(a) is focused on two perceived ills when an attorney has material adversity with a former client: could the lawyer be in a position to use "confidential information" against the former client, or would the underlying facts learned in the earlier representation assist the lawyer in prosecuting the new matter against that former

client.  *Trupos*, 201 N.J. at 467.  Put more simply, could the information learned from the prior representation be used against the former client in the new case?

That is not a concern here.  Fish has limited the scope of the MIAX representation to avoid all such possibilities.  And as an extra prophylactic, the attorneys in the Boston office have been screened from this matter.  Not only is the information in that Boston office irrelevant to Fish's representation of MIAX, but the Fish attorneys on this case would not even be able to access such information if it were relevant.  Because disqualification would in no way serve the goals animating *RPC* 1.9(a), disqualification is inappropriate.

## IV.   CONCLUSION

For the foregoing reasons, the Motion to Disqualify should be denied.

Dated:          April 2, 2018          Respectfully submitted,

By:   s/ Michael B. Himmel
      Michael B. Himmel
      David M. Wissert
      Peter Slocum
      Lowenstein Sandler LLP
      One Lowenstein Drive
      Roseland, New Jersey 07068
      Telephone: (973) 597-6172
      mhimmel@lowenstein.com
      dwissert@lowenstein.com
      pslocum@lowenstein.com

      *Attorneys for Fish & Richardson P.C.*

-40-