## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NASDAQ, INC.; NASDAQ ISE, LLC; AND FTEN, INC.; <br><br> Plaintiffs, <br><br> v. <br><br> MIAMI INTERNATIONAL HOLDINGS, INC.; MIAMI INTERNATIONAL SECURITIES EXCHANGE, LLC; MIAX PEARL, LLC; AND MIAMI INTERNATIONAL TECHNOLOGIES, LLC; <br><br> Defendants. | Civil Action 3:17-cv-06664-BRM-DEA |

## <u>REPLY BRIEF IN SUPPORT OF PLAINTIFF NASDAQ, INC.'S MOTION TO DISQUALIFY FISH & RICHARDSON P.C.</u>

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

ARGUMENT ......................................................................................................4

    A.    Fish's Attempt to Circumvent An Obvious Conflict Should Be Rejected..........................................................................................4

        1.    Fish's Limited Representation Argument is Unavailing ....................................................................................4

        2.    The Two Matters Are Substantially Related.............................9

        3.    Fish's Argument Against "Adversity" to a Former Client is a Red Herring ...........................................................11

        4.    Fish Does Not Protest Against Automatic Imputation ............12

    B.    The Balance of the Equities Tip in Favor of Disqualification ...........13

CONCLUSION ..................................................................................................15

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Asyst Techs., Inc. v. Empak, Inc.*,
  962 F. Supp. 1241 (N.D. Cal. 1997) .................................................................11

*Barry v. Medtronic, Inc.*,
  No. 1:14-cv-104, 2015 WL 12915556 (E.D. Tex. Aug. 14, 2015) ......................15

*Buysse v. Baumann-Furrie & Co.*,
  448 N.W.2d 865 (Minn. 1989) .............................................................................5

*Cafaro v. HMC Int'l, LLC*,
  No. 07-cv-2793, 2012 WL 4857763 (D.N.J. Oct. 11, 2012).................................5

*Carlyle Towers Condominium Ass'n, Inc. v. Crossland Sav., FSB*,
  944 F.Supp. 341 (D.N.J. 1996).............................................................................14

*Carreno v. City of Newark*,
  834 F. Supp. 2d 217 (D.N.J. 2011)........................................................... 4, 13, 14

*City of Atlantic City v. Trupos*,
  201 N.J. 447 (2010) .................................................................................... passim

*Dewey v. R.J. Reynolds Tobacco Co.*,
  109 N.J. 201 (1988) .................................................................................. 12, 15

*Fitzgerald v. Linnus*,
  336 N.J. Super. 458 (App. Div. 2001)....................................................................4

*G.F. Indus., Inc. v. Am. Brands, Inc.*,
  245 N.J. Super. 8 (1990)........................................................................................4

*In re Enron Corp.*,
  No. 01-16034, 2002 WL 32034346 (Bankr. S.D.N.Y. 2002) ...............................5

*Innovative Memory Solutions, Inc. v. Micron Tech., Inc.*,
  No. CV 14-1480-RGA, 2015 WL 2345657 (D. Del. 2015)...................................4

*Kaselaan & D'Angelo Associates, Inc. v. D'Angelo*,
  144 F.R.D. 235 (D.N.J. 1992) ............................................................................11

*Lerner v. Laufer*,
359 N.J. Super. 201 (App. Div. 2003)....................................................................4

*Milwaukee Elec. Tool Corp. v. Hilti, Inc.*
No. 14-cv-1288, 2015 WL 1898393 (E.D. Wis. 2015)...........................................5

*Multimedia Patent Trust v. Apple, Inc.*
2011 WL 1636928 (S.D. Cal. 2011) ........................................................ 6, 7, 8, 9

*Reardon v. Marlayne, Inc.*,
83 N.J. 460 (1980) .................................................................................................4

*Rembrandt Techs., LP v. Comcast Corp.*,
No. 2:05-CV-443, 2007 WL 470631 (E.D. Tex. Feb. 8, 2007) ...........................11

*Rohm and Haas Co. v. Am. Cyanamid Co.*,
187 F. Supp. 2d 221 (D.N.J. 2001)......................................................................12

*Steel v. GM Corp.*,
912 F. Supp. 724 (D.N.J. 1995).............................................................................13

*Sumitomo Corp. v. J.P. Morgan & Co., Inc.*,
No. 99-cv-8780, 2000 WL 145747 (S.D.N.Y. 2000)............................................5

*Twenty-First Century Rail Corp. v. N.J. Transit Corp.*,
419 N.J. Super. 343 (App. Div. 2011).....................................................................4

*United States v. Jeffers*,
520 F.2d 1256 (7th Cir. 1975) .................................................................................5

*Wyeth v. Abbott Labs.*,
692 F. Supp. 2d 453 (3d Cir. 2010)............................................................. 13, 14

## <u>Rules</u>

RPC 1.2………………………………………………………………………….9

RPC 1.4………………………………………………………………………....9

RPC 1.6………………………………………………………………………...14

RPC 1.7……………………………………………………………….…..9, 14

RPC 1.9............................................................................................................passim

RPC 1.10……………………………………………………………………12, 13, 14

## **Other Authorities**

*D.C. Bar Ethics Opinion* No. 343……………………………………………… 1, 3, 7, 8

*Restatement (Third) of the Law of Lawyering* (2000)………………………...1, 6, 7

*New Jersey Attorney Ethics—The Law of New Jersey Lawyering* (2011)…………9

Fish represented Nasdaq, Inc. ("Nasdaq") in IP matters *for over 13 years*. When Fish was approached by MIAX about battling its former client in a case involving *multiple patents that Fish prosecuted*, Fish should have said "no" or sought Nasdaq's consent as required by RPC 1.9(a). Instead, Fish crafted a "limited scope representation" agreement designed to circumvent the conflict. But Fish's opposition brief cites to *no case in history* where a "limited scope" arrangement negated a conflict of this magnitude.

The authorities that Fish does rely on come up short. The crux of Fish's brief is an illustration in the *Restatement (Third) of the Law of Lawyering* (2000). Opp. Br. at 11. But in that illustration, a limited scope engagement was tolerated only where the engagement *excluded* "dealing with disputes" between the former and current client, exactly the opposite of what Fish is trying to do here.[1] Fish also relies heavily on *D.C. Bar Ethics Opinion* No. 343. Opp. Br. at 13. But that opinion makes clear that where a lawyer represented a former client in a patent infringement case relating to the same underlying technology, the lawyer would *not* be able to represent a new client in patent litigation against that former client, even if it were a different patent dispute.[2] A limited scope representation would only be permissible with respect to a discrete, pre-litigation patent assignment issue that had nothing to do with a claim of infringement against the former client.

---

[1] *See Restatement*, § 121, ill. 4 (addressing "[a]n agreement between Lawyer and Client [MIAX] that the scope of the Lawyer's representation of Client will *not* extend to dealing with disputes with Manufacturer [Nasdaq]") (emphasis added).

[2] *See* D.*C. Bar Ethics Op.* 343 ("[T]hat Lawyer must ensure that her participation in the case *never extends to the patent infringement issues*.") (emphasis added).

1

There is no legal support for Fish's position. But more importantly, there is real concern that Fish's continued participation will prejudice Nasdaq. ***First***, the very patents Fish prosecuted for Nasdaq are part of this lawsuit. Fish promises not to participate in that part of the case, but that is fantasy. To give a concrete example, Fish prepared the initial draft of the motion to dismiss, and while it says it only prepared "those portions of the brief" that involve the patents it did not prosecute, there is ***one section*** of the brief advocating dismissal of all of the claims on the same ground, including those that Fish previously advised Nasdaq and the Patent Office ***were patentable***.[3] A Fish lawyer also took the lead on a call with the Court where he argued the motion to dismiss should be adjudicated before this motion because it might lead to dismissal of this entire case, including those patents his firm prosecuted. MIAX's coordinated strategy continued with the filing of post-grant review petitions against all the patents in the case, which again made the same § 101 arguments across the board. And it will continue throughout this lawsuit, because as one might expect, MIAX will need to coordinate its arguments and positions on discovery, infringement and validity, and damages across all of the asserted claims. Fish unavoidably will be involved in these strategy calls, and if its work on the dismissal motion is any guide, it will be calling the shots.

***Second***, Fish points to the three patents that are assigned to Nasdaq's co-plaintiffs FTEN and Nasdaq ISE, and asks why the "happenstance" of their

---

[3] *See* Dkt. 28-1 at 15-18 ("Because *Alice* and its progeny make clear that the patents-in-suit do not claim patent-eligible subject matter, Nasdaq's Counts I through VII [*i.e.*, all of the patent claims in the case] should be dismissed with prejudice.").

assertion in the same lawsuit as the Nasdaq patents should be cause for disqualification. But it wasn't just "happenstance." As the complaint in this case makes clear, all of the patents-in-suit relate to "methods and systems for automated securities trading, including options trading," Compl. ¶20, and the accused instrumentalities are the same for all of them. That is further reason why Fish should be disqualified. The field of technology at issue in this case is the same field for which Fish provided IP counseling to and prosecuted patents for Nasdaq for years. *See D.C. Bar Ethics Op.* 343 (noting where lawyer participated in *different* patent case for a former client "involving the same underlying technology," lawyer could not be involved in a patent infringement case against that client). *See also* Declaration of K. Johnny Simonsson (detailing the IP counseling work Fish provided to Nasdaq over the course of 13 years).

*Third*, disregarding its conflicted position, Fish chose to serve as "lead counsel" on the trade secret claims being asserted by Fish's prior client Nasdaq. Fish should not be permitted to represent MIAX against Nasdaq on trade secret claims in the same technological field in which it once helped Nasdaq to build a patent portfolio. Questions about whether the asserted trade secrets are actually trade secrets, were publicly disclosed, and their value, will necessarily come up, and may implicate confidential information that Nasdaq provided to Fish during its 13-year relationship. The bottom line: no litigant should ever have to look across the courtroom and face their own lawyer, who they provided their confidences to for over a decade, in a case involving the very patents the lawyer helped the litigant obtain. Indeed, the cases closest in facts to those presented here have

uniformly held that disqualification is the appropriate remedy. *See, e.g.*, *Innovative Memory Solutions, Inc. v. Micron Tech., Inc*., No. CV 14-1480-RGA, 2015 WL 2345657, at *5 (D. Del. 2015) (disqualifying patentee's lawyers because they previously represented defendant in cases involving the same technology as the asserted patents). Disqualification respectfully should be granted.

## ARGUMENT

### A.   Fish's Attempt to Circumvent An Obvious Conflict Should Be Rejected

New Jersey strictly construes RPC 1.9, *G.F. Indus., Inc. v. Am. Brands, Inc.,* 245 N.J. Super. 8, 13 (1990), and "any doubt as to the propriety of an attorney's representation of a client . . . must be resolved in favor of disqualification" to ensure the protection of client confidences. *Reardon v. Marlayne, Inc.,* 83 N.J. 460, 471 (1980); *Twenty-First Century Rail Corp. v. N.J. Transit Corp.,* 419 N.J. Super. 343, 358 (App. Div. 2011), *rev'd on other grounds*, 210 N.J. 264 (2012); *Carreno v. City of Newark*, 834 F. Supp. 2d 217, 225 (D.N.J. 2011).

#### 1.   Fish's Limited Representation Argument is Unavailing

Fish attempts to bypass the application of the "substantial relationship" test using a representation agreement with a limited scope designed to circumvent Fish's ethical conflict under RPC 1.9(a). Opp. Br. at 10-21. As Fish acknowledges, this Court should look primarily to New Jersey state court opinions to determine whether that is a permissible way to avoid a conflict with a former client. Opp. Br. at 9. Yet, Fish has failed to cite *a single New Jersey case* or any New Jersey authority endorsing such an approach. Neither *Lerner v. Laufer*, 359 N.J. Super.

4

201, 217 (App. Div. 2003), nor *Fitzgerald v. Linnus*, 336 N.J. Super. 458, 470 (App. Div. 2001), opined on the propriety of limited scope representation agreements in the context of attorney disqualification. *See* Opp. Br. at 10-11. *Cafaro v. HMC Int'l, LLC*, No. 07-cv-2793, 2012 WL 4857763, at *6 (D.N.J. Oct. 11, 2012) does not involve any circumscribed retention agreements. Fish's cited opinions from the courts of other states are equally distinguishable.[4]

---

[4] The *Buysse v. Baumann-Furrie & Co.* case was decided under Minnesota law, and the trial court declined to order disqualification on account of the "balanc[e] of the equities," finding that "[a]t this late date," it would have caused "a severe hardship on the judgment creditors to deny them their chosen counsel." 448 N.W.2d 865, 869 (Minn. 1989*). Sumitomo Corp. v. J.P. Morgan & Co., Inc.*, No. 99-cv-8780, 2000 WL 145747 (S.D.N.Y. 2000), is likewise inapposite because the concurrent adverse representation there was evaluated under Canon 5 of New York's Code of Professional Responsibility, which finds disqualification appropriate "only . . . where the attorney's conflict undermines a court's confidence in the vigor of the attorney's representation of his client." *Id.* at *4. *United States v. Jeffers*, 520 F.2d 1256 (7th Cir. 1975), a criminal ineffective assistance of counsel case involving conspiracy to distribute drugs, was where the trial court did not find that an overly cautious defense attorney to be conflicted because one of the government's witnesses was his client in a previous, unrelated homicide case. Likewise, the Enron bankruptcy case is distinguishable outright because, under New York law, the use of "conflicts counsel, limited engagement agreements, and ethical walls" are "customary" in "large bankruptcy cases" where conflicts are all but unavoidable. *In re Enron Corp.*, No. 01-16034, 2002 WL 32034346, at *10-11 (Bankr. S.D.N.Y. 2002). Finally, the facts in *Milwaukee Elec. Tool Corp. v. Hilti, Inc.* are the direct opposite of the facts in this case. No. 14-cv-1288, 2015 WL 1898393 (E.D. Wis. 2015). There, a third-party intervenor sought the disqualification of plaintiffs' counsel, DLA Piper, in seven out of the eight cases filed because it was a current client. *Id.* at *1. Because DLA Piper did not appear for the plaintiffs in the eighth case filed against the intervenor-movant, the court declined to disqualify DLA Piper because there was no "direct adversity." *Id.* at *3. The *Multimedia Patent Trust v. Apple, Inc.* case is distinguishable on the same basis because a non-party sought, and was denied, the disqualification of plaintiff's counsel. No. 10-cv-2618, 2011 WL 1636928 (S.D. Cal. 2011).

Because Fish could not identify any supporting judicial authority from New Jersey, or even the Third Circuit, it attempts to support its position by citing to the *Restatement (Third) of the Law of Lawyering* and ethics opinions from the bars of the District of Columbia and New York. Upon closer scrutiny, however, these non-judicial sources undermine Fish's argument.

Section 121, comment c(iii), of the *Restatement* notes that "some conflicts can be eliminated by an agreement limiting the scope of the lawyer's representation if the limitation can be given effect without rendering the remaining representation objectively inadequate." Opp. Br. at 11. Yet, in Illustration 4 (cited by Fish), the sample retention agreement that the Lawyer executes with a new Client to avoid a conflict with Manufacturer, also a client of Lawyer, demonstrates the insufficiency of Fish's "limited scope" representation for conflicts purposes.[5] *Restatement*, § 121 comment c(iii). To eliminate Fish's conflict, Restatement § 121 would require Fish (Lawyer) to craft a representation agreement that avoids <u>all</u> disputes involving both MIAX (Client) and Nasdaq (Manufacturer)—it would not have allowed Fish to represent MIAX if Nasdaq is on the other side. *See id.*

Fish also relies on *Restatement* § 132, comment e, as authority permitting a lawyer to "limit the scope of representation to a later client so as to avoid

---

[5] Illustration 4: A new Client retained Lawyer in "general business matters." New Client has a distribution contract with Manufacturer, who Lawyer also represents "in local real-estate matters completely unrelated to Client's business." Restatement, § 121 comment c(iii). To avoid a conflict, Lawyer limits the "scope of Lawyer's representation of Client [so that it] will not extend to dealing with disputes with Manufacturer." *Id.* Thus, the Lawyer refused to meddle in *any and all* disputes between the new Client and the Manufacturer—not only disputes arising out of the "distribution contract" or matters involving "local real estate." *Id.*

representation substantially related to that undertaken for a previous client." Opp. Br. at 11. Fish neglects to acknowledge, however, that comment e explicitly warns that: "[a] later representation is <u>prohibited</u> if the second client's interests are materially adverse to those of the former client" and "[t]he scope of a client's interests is normally determined by the scope of work that the lawyer undertook in the former representation." *Restatement*, § 132 comment e. Applying these terms, there can be no dispute that Fish's representation of MIAX is prohibited because MIAX's interests in invalidating Nasdaq's patents in the current litigation are adverse to Nasdaq's interests in obtaining a judgment of infringement and not-invalidity for the asserted patents, including those Fish previously prosecuted.[6] Indeed, the rationale underlying "the prohibition against switching sides in a matter is basic and longstanding. The obligation to represent the client with undivided fidelity and not to divulge its secrets or confidences forbids the subsequent acceptance of employment from others in matters adversely affecting <u>any interest</u> of the client with respect to which confidence has been reposed." *Id.* at comment b.

Similarly, *D.C. Bar Ethics Opinion* No. 343 cited by Fish belies Fish's argument that its "joint representation" of MIAX with Reed Smith is sufficient to help Fish avoid its conflict of interest. Opp. Br. at 13. The ethics opinion permits, "[s]ubject to certain conditions, a lawyer [to] limit the scope of the new

---

[6] In addition, Illustration 5 (which Fish cites at Opp. Br. at 13) reinforces the rule that a lawyer cannot represent a later client (Client B) if that work is substantially related to the lawyer's work for the former client (Client A) (*i.e.* in obtaining FDA approval for a drug X for treating diseases of the eye) and therefore might adversely affect the former client (*e.g.* "significantly reduc[e] the profitability of Client A's drug X"). *Id.*

representation such that factual information normally obtained in the prior matter would be legally irrelevant to the advancement of the current client's position in the new matter." *D.C. Bar Ethics Op.* No. 343. But the specific patent litigation-related example of a properly circumscribed representation has the "Lawyer inform[] Client [MIAX] that she cannot participate in the patent infringement action against Company [Nasdaq] but that she could represent Client on the limited question [of] whether Client's own patent had been properly assigned to it." *Id.* In other words, the Lawyer declined to be adverse to Company in an infringement suit, urged the "Client [to] hire other lawyers to prosecute its infringement claims" against Company, and limited her representation to providing a legal opinion about the "threshold legal issue" of standing to sue on a patent. *Id.* Lawyer declined to be adverse to its former client Company ***even though*** the former matter was a "different patent infringement case involving the same underlying technology." *Id.* In contrast, here, Fish is not limiting its representation to a threshold or collateral issue in the case, but rather it is going whole hog, even serving as lead counsel on trade secret claims advanced by its former client in the same technological field as the intellectual property that Fish once helped Nasdaq secure.

Indeed, if anything, *D.C. Bar Ethics Opinion No.* 343 serves as a reminder that having a limited scope representation does not automatically sever the "substantial relationship" tie between former and current matters:

> We are mindful of the Court of Appeals' admonition . . . that even if a lawyer sincerely believes that his or her representation "could be insulated, factually and ethically," from the earlier representation, the belief might be mistaken. In that case, "[t]he 'substantially related' test by its terms, ... is meant to induce a ... lawyer considering a

representation to err well on the side of caution."

*See id.* If a lawyer had acquired confidential information in representing a former client that can be used against the client in a subsequent adverse representation, then the matters are "substantially related" and the lawyer must be disqualified. *City of Atlantic City v. Trupos*, 201 N.J. 447, 467 (2010).

### 2. The Two Matters Are Substantially Related

Fish attempts to redefine "matter" in order to sidestep the "substantially related" test, arguing that Fish's "patent prosecution work" for Nasdaq was one "matter" and that Fish's limited representation of MIAX against Nasdaq's "trade secret allegations" and three of seven patents-in-suit comprises a separate "matter." Opp. Br. at 31. This illusory dissecting of the case should be rejected. The New Jersey RPCs, as well as the authorities cited by Fish, consistently use the term "matter" to refer to a "case," "controversy," or "litigation"[7]—not a subset of causes of action within a case cherry-picked to suit Fish's own purposes.[8] Fish has failed

---

[7] *See, e.g.,* RPC 1.2(a) (requiring a "lawyer [to] abide by a client's decision whether to settle a matter"); RPC 1.4(b) (lawyers "shall keep a client reasonably informed about the status of a matter"); RPC 1.5 (allows lawyer's fees to be "contingent on the outcome of the matter for which the service is rendered . . . [u]pon [its] conclusion"); RPC 1.7(b)(1) (lawyer may concurrently "represent[] multiple clients in a single matter" so long as each client gives informed consent). Consistent with the RPC's usage of "matter," the Michels treatise, cited by Fish at Opp. Br. at 31, defines "matters" to be "cases." Kevin H. Michels, *New Jersey Attorney Ethics—The Law of New Jersey Lawyering* § 21:4 at 554 (2011) ("the matters themselves—the cases—must be substantially related"). The *Trupos* opinion from the N.J. Supreme Court also uses the term "matter" interchangeably with "litigation" or "controversy." 201 N.J. at 462, 463; *see* Opp. Br. at 22.

[8] Fish uses the term incorrectly to refer to "allegations" *within* a matter. Opp. Br. at 31 ("Fish formerly prosecuted certain patents on behalf of NASDAQ. Now, Fish

9

to cite any New Jersey authority to support application of the "substantially related" test to piecemeal allegations in a complaint.

Fish acknowledges the *Trupos* test for whether matters are deemed to be "substantially related" under RPC 1.9(a).[9] The facts here easily satisfy both prongs of the test. Fish's provision of IP counseling advice to Nasdaq over the course of 13 years made Fish attorneys privy to confidential information relating both to Nasdaq's trade secret and patent infringement claims. *See* Simonsson Decl. (explaining same). Fish not only possesses knowledge relating *generally* to Nasdaq's prosecution strategy and approach to defending the validity of its patents, but also *specifically* as to the intended meaning and scope of each of the patented claims, their potential to be infringed, their validity strength, and even facts tending to establish their enforceability (because Fish attorneys are the very counsel who prosecuted the patents). In addition to the foregoing strategy and patent-specific information Fish learned from its work for Nasdaq, Fish also learned sensitive confidences about Nasdaq's proprietary electronic trading technology, including what information Nasdaq elected to protect as trade secrets. *See id.*

---

seeks to be adverse to NASDAQ with respect to certain trade secret <u>allegations</u>. . . . these <u>matters</u> are [not] 'substantially related'". . . .).

[9] Two matters are "substantially related" if: (1) the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent matter, *or* (2) facts relevant to the prior representation are both relevant and material to the subsequent representation. *Trupos*, 201 N.J. at 467; Opp. Br. at 29.

Such information[10] can not only be used against Nasdaq by MIAX in the current matter (for example, MIAX could use the information to try to defeat Nasdaq's trade secret claims or to select weaker patent claim terms for claim construction; to pick the "strongest" prior art to attack the validity of certain patent claims; or to evaluate whether to pursue an unenforceability counterclaim), but the facts are also relevant and material—even essential—to Fish's subsequent defense of MIAX, who is likely to dispute the fact that Nasdaq's alleged trade secrets are trade secrets at all, the § 103 validity or § 102 novelty of the patent claims, and the enforceability of one or more asserted patents down the line. There can be no doubt that Fish's decade-long IP counseling and prosecution work for Nasdaq allowed Fish to gain access to confidential information and facts that can be used to Nasdaq's detriment in its case against MIAX. *See* Simonsson Decl.[11]

### 3. Fish's Argument Against "Adversity" to a Former Client is a Red Herring

Fish does not dispute that Nasdaq is a former client, but attempts to argue that because Nasdaq's wholly-owned subsidiaries, co-Plaintiffs Nasdaq ISE, LLC

---

[10] Nasdaq will make available privileged attorney-client communications with its former counsel to establish the actual receipt of confidential information by Fish *in camera* to the Court, if necessary.

[11] *Kaselaan & D'Angelo Associates, Inc. v. D'Angelo*, 144 F.R.D. 235, 240-41 (D.N.J. 1992) (finding attorney's longstanding relationship with former client to favor disqualification because the various confidences gained there "could be used to the substantial disadvantage of his former client . . . even though such general information may not have been specifically relevant to the merits of the [subsequent] dispute"); *Asyst Techs., Inc. v. Empak, Inc.*, 962 F. Supp. 1241, 1242 (N.D. Cal. 1997) ("Few people are more likely to have confidential information with which to attack the validity of a patent than the lawyers who prosecuted it.").

and FTEN, Inc., are not former clients of Fish, somehow Nasdaq cannot demonstrate adversity. Opp. Br. at 23-25. But there is no requirement that to be "adverse," all parties on one side of a lawsuit must have a conflict. Nasdaq has standing to move for disqualification on its own. *See, e.g.*, *Rembrandt Techs., LP v. Comcast Corp.*, No. 2:05-CV-443, 2007 WL 470631, at *4 (E.D. Tex. Feb. 8, 2007) (granting third-party intervenor's motion to disqualify plaintiffs' counsel in related cases that assert the same patents). As a matter of law, the requirement is met when parties are on opposite sides of a "matter." *Rohm and Haas Co. v. Am. Cyanamid Co.*, 187 F. Supp. 2d 221, 228 (D.N.J. 2001) (finding adversity because the same firm is representing its current client against a former client).[12]

### 4.   Fish Does Not Protest Against Automatic Imputation

Fish does not dispute the automatic application of imputation once a violation of RPC 1.9(a) is found, nor can it. Imputation is mandated by RPC 1.10(a).[13] *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 217 (1988) (The New Jersey Supreme Court has found that RPC 1.10(a) "applies a *per se* rule of imputed disqualification to lawyers currently practicing together in close association, without regard to whether there has been an actual sharing of client confidences.").

---

[12] *Trupos* also frames the inquiry as being litigation-centric: whether "the lawyer(s) for whom disqualification is sought [1] formerly represented their present adverse party and that [2] the present litigation is materially adverse to the former client." 201 N.J. at 462; *see also* Opp. Br. at 22 ("First, the law firm must have 'formerly represented' the entity asserting disqualification. *Id.* Second, the subsequent matter must be 'materially adverse' to the interests of that former client. *Id.*") (citing *Trupos*, 201 N.J. at 463).

[13] RPC 1.10(a) states: "When lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by . . . RPC 1.9."

Thus, if the Court finds a conflict under RPC 1.9(a), RPC 1.10(a)'s application is automatic. Here, there is no doubt that Fish "knowingly" represented a new client in violation of RPC 1.10(a), when at least six of its currently practicing attorneys would have been prohibited from doing so under RPC 1.9(a). *See* Dkt. 69-5.

Nor can Fish cure its conflict of interest through an ethical wall it supposedly erected, but notably failed to produce any evidence of. Fish assures the Court and Nasdaq that its screening protocol is effective to eliminate the conflict and to allow it to keep its former client's confidences. Opp. Br. at 2, 7, 18-19, 38-40. But the ethical wall defense is unavailable to Fish under RPC 1.10(a) because "the language of RPC 1.10 is absolute, and an ethics screen designed to prevent the imputed disqualification of an entire firm is only recognized in the case of a former government attorney [under RPC 1.11]" or under RPC 1.10(c) for when a lawyer becomes associated with a firm.[14] Moreover, Fish's wall was erected years too late. Fish erected the wall only ***after*** it was approached by MIAX to represent it in this case, meaning that ***for 20 years, there was no wall*** between the lawyers who were working on Nasdaq's cases, and the other Fish lawyers who are working and who may work on this lawsuit in defense of MIAX.

### B.   The Balance of the Equities Tip in Favor of Disqualification

New Jersey strictly construes RPC 1.9, and if there is any doubt as to the propriety of an attorney's representation of a client, such doubt must be resolved in

---

[14] *See Steel v. GM Corp.*, 912 F. Supp. 724, 741-43 (D.N.J. 1995), *aff'd sub nom. Cardona v. GM Corp.*, 942 F. Supp. 968, 977 (D.N.J. 1996) (noting that "New Jersey and its courts have refused to adopt [ethical walls], except in extremely limited circumstances").

favor of disqualification. *Carreno*, 834 F. Supp. 2d at 225. A court thus has wide discretion to structure the balancing inquiry however it desires. *Id.* (ordering disqualification without a balancing test).

Disqualification of Fish in this case is warranted under the *Carlyle Towers Condominium Ass'n, Inc. v. Crossland Sav., FSB*, 944 F.Supp. 341 (D.N.J. 1996) factors.[15] On balance, Nasdaq would suffer more prejudice if Fish's representation of MIAX is allowed. Under RPCs 1.9(a) and 1.10(a), continued representation by a conflicted firm is permitted only if the affected client consents. Fish has not requested consent and Nasdaq has determined, under all the circumstances, to withhold it given its legitimate concerns, including the integrity of the profession and the litigation process, its right to the continued loyalty of former counsel and the safeguarding of its information pursuant to RPC 1.6, the depth and scope of Fish's prior work and counseling in the same technological space and on the same IP assets being asserted here against MIAX (as well as the related sensitive information Fish acquired or had access to and Fish's ability to use such information against Nasdaq to benefit MIAX in the case), and the sheer number of conflicted lawyers at Fish and Fish's dismissive attitude in response to these conflicts. Courts allow conflicted counsel to continue a representation only in the

---

[15] Contrary to Fish's argument at Opp. Br. at 35-36, there is no requirement that the Court must march through the twelve factors proposed by Fish, the latter six of which are irrelevant because there is no concurrent conflict under RPC 1.7 at issue. *Compare Wyeth v. Abbott Labs*., 692 F. Supp. 2d 453, 459 (3d Cir. 2010) (enumerating six *Carlyle Towers* factors to be relevant to disqualification and six additional factors "in this case to address the . . . concurrent representation" conflict under RPC 1.7) with *Carreno*, 834 F. Supp. 2d at 225 (ordering disqualification without a balancing test).

most "extraordinary" and "unusual case." *Dewey*, 109 N.J. at 219-21.

By contrast, prejudice to MIAX would be minimal if Fish were disqualified. First, this case is still at the pleadings stage. Second, MIAX has been represented by Reed Smith since the inception of the case, whose ability to get up to speed on the facts and issues should not be overly costly in terms of time or money because, under the terms of the joint representation agreement, it was already required to work and coordinate with Fish in its joint defense of MIAX. *Barry v. Medtronic, Inc.*, No. 1:14-cv-104, 2015 WL 12915556, at *9-10 (E.D. Tex. Aug. 14, 2015) (disqualifying firm as trial counsel in patent case, finding that any "inconvenience and duplication of effort" for co-counsel to now take the lead creates no substantial hardship because co-counsel had been retained since inception of case).

Lastly, but importantly, Fish is responsible for creating its own conflict in this case by not disclosing it to Nasdaq; instead, Fish went out of its way to circumvent the conflict. Nasdaq disagrees with Fish's suggestion that it is the combination of Nasdaq's trade secrets and related patent allegations against MIAX into a single lawsuit that created Fish's conflict. Opp. Br. at 37. Quite the opposite, Fish should have been forthcoming about its conflict rather than point its finger at Nasdaq for exercising plaintiff's prerogative in structuring the litigation in a reasonable way, by combining claims arising in the same technological field.

## CONCLUSION

For the foregoing reasons, Nasdaq respectfully requests that this Court disqualify Fish & Richardson P.C. from representing MIAX in this case.

Dated:  April 16, 2018                    Respectfully submitted,

By:  *s/ Michael Critchley, S*r.
    Michael Critchley, Sr.
    Critchley, Kinum & Denoia, LLC
    75 Livingston Ave, Suite 303
    Roseland, New Jersey 07068
    Telephone: (973) 422-9200
    mcritchley@critchleylaw.com

    Arun S. Subramanian (*pro hac vice*)
    Jacob W. Buchdahl (*pro hac vice*)
    Susman Godfrey L.L.P.
    1301 Avenue of the Americas, 32nd Floor
    New York, New York 10019
    Telephone: (212) 336-8330
    asubramanian@susmangodfrey.com
    jbuchdahl@susmangodfrey.com

    Floyd G. Short (*pro hac vice*)
    Susman Godfrey L.L.P.
    1201 Third Avenue, Suite 3800
    Seattle, Washington 98101
    Telephone: (206) 516-3880
    fshort@susmangodfrey.com

    Meng Xi (*pro hac vice*)
    Susman Godfrey L.L.P.
    1900 Avenue of the Stars, Suite 1400
    Los Angeles, California 90067
    Telephone: (310) 789-3100
    mxi@susmangodfrey.com

    ***Attorneys for Plaintiffs Nasdaq, Inc., Nasdaq***
    ***ISE, LLC, and FTEN, Inc.***