# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NASDAQ, INC.; NASDAQ ISE, LLC; AND FTEN, INC.;<br><br>        Plaintiffs,<br><br>   v.<br><br>MIAMI INTERNATIONAL HOLDINGS, INC.; MIAMI INTERNATIONAL SECURITIES EXCHANGE, LLC; MIAX PEARL, LLC; AND MIAMI INTERNATIONAL TECHNOLOGIES, LLC;<br><br>        Defendants. | Civil Action 3:17-cv-06664-BRM-DEA<br><br>Hon. Brian R. Martinotti, U.S.D.J.<br><br><br>Motion Return Date: October 15, 2018 |

## PLAINTIFF NASDAQ, INC.'S RESPONSE IN OPPOSITION TO THE APPEAL OF THE SEPTEMBER 6, 2018 ORDER DISQUALIFYING FISH & RICHARDSON P.C.

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................1

II.    FACTUAL AND PROCEDURAL BACKGROUND ....................................2

       A.     The Current Lawsuit ........................................................................2

       B.     Fish Served As Intellectual Property Counsel to Nasdaq For
              Thirteen Years and Prosecuted Four of the Seven Patents-in-
              Suit ....................................................................................................3

       C.     Fish Was Engaged by MIAX in This Matter To Be
              Materially Adverse to Nasdaq ..........................................................4

III.   LEGAL ARGUMENT .................................................................................6

       A.     Standard of Review ...........................................................................6

       B.     Fish's   Limited   Scope   Representation   Argument   is
              Unavailing .........................................................................................7

              1.     A Limited Scope Representation Does Not Work to
                     Immunize the Conflict at Hand ...............................................8

              2.     RPC 1.2(c) Cannot Be Used to "Cure" Fish's Conflict ..........15

       C.     The Magistrate Judge Was Correct Not to Divide the Instant
              Lawsuit Into Two Distinct "Matters" For Conflicts Purposes ..........17

       D.     Magistrate   Judge   Arpert   Correctly   Found   Fish's
              Disqualification   to   be   Warranted   Under   *Trupos'*
              "Substantially Related" Test ............................................................19

              1.     Nasdaq Was Indisputably A Former Client of Fish ................19

              2.     Magistrate Judge Arpert Correctly Found A "Very
                     Substantial Relationship Between This Matter and
                     Fish's Prior Representation of Nasdaq" .................................22

              3.     Fish Does Not Contest the "Materially Adverse"
                     Finding .................................................................................28

4.      Fish Gives No Reason to Disturb Magistrate Judge
                Arpert's "Imputation" Finding .................................................28

        E.      The Magistrate Judge Was Within His Discretion to Find
                That the Balance of the Equities Tip in Favor of
                Disqualification .................................................................................29

IV.     CONCLUSION ...........................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asyst Techs., Inc. v. Empak, Inc.*,
 962 F. Supp. 1241 (N.D. Cal. 1997).................................................................26

*Barry v. Medtronic, Inc.*,
 No. 1:14-cv-104, 2015 WL 12915556 (E.D. Tex. Aug. 14, 2015)....................32

*Bowen v. Parking Authority of City of Camden*,
 No. 00-5765, 2002 WL 1754493 (D.N.J. July 30, 2002)................................6, 7

*Buysse v. Baumann-Furrie & Co.*,
 448 N.W.2d 865 (Minn. 1989*)*...........................................................................8

*Cafaro v. HMC Int'l, LLC*,
 No. 07-cv-2793, 2012 WL 4857763 (D.N.J. Oct. 11, 2012)..............................8

*Cardona v. General Motors Corp.*,
 942 F. Supp. 968 (D.N.J. 1996)........................................................................25

*Carlyle Towers Condominium Ass'n, Inc. v. Crossland Sav., FSB*,
 944 F.Supp. 341 (D.N.J. 1996)..............................................................7, 30, 36

*Carreno v. City of Newark*,
 834 F. Supp. 2d 217 (D.N.J. 2011)...............................................................7, 30

*City of Atlantic City v. Trupos*,
 201 N.J. 447 (2010) .....................................................................7, 14, 22, 25

*Cooper Hosp./Univ. Med. Ctr. v. Sullivan*,
 183 F.R.D. 119 (D.N.J. 1998).........................................................................30

*Dewey v. R.J. Reynolds Tobacco Co.*,
 109 N.J. 201 (1988) ................................................................................29, 36

*In re Corn Derivatives Antitrust Litig.*,
 748 F.2d 157 (3d Cir. 1984) ...........................................................................31

*In re Enron Corp.*,
   No. 01-16034, 2002 WL 32034346 (Bankr. S.D.N.Y. 2002) ......................9, 10

*Fitzgerald v. Linnus*,
   336 N.J. Super. 458 (App. Div. 2001) ........................................................15, 16

*Ford Motor Co. v. Edgewood Props., Inc.*,
   No. 06-cv-1278, 2011 WL 5080347 (D.N.J. 2011) ....................... 19, 20, 21, 27

*Haines v. Liggett Grp. Inc.*,
   975 F.2d 81 (3d Cir. 1992) .........................................................................6, 7

*Kaselaan & D'Angelo Associates, Inc. v. D'Angelo*,
   144 F.R.D. 235 (D.N.J. 1992) ........................................................................26

*Lerner v. Laufer*,
   359 N.J. Super. 201 (App. Div. 2003) ........................................................15, 16

*Milwaukee Elec. Tool Corp. v. Hilti, Inc.*
   No. 14-cv-1288, 2015 WL 1898393 (E.D. Wis. 2015) ......................................9

*Multimedia Patent Trust v. Apple, Inc.*
   No. 10-cv-2618, 2011 WL 1636928 (S.D. Cal. 2011) ....................................10

*Reardon v. Marlayne, Inc.*,
   83 N.J. 460 (1980) ....................................................................................7, 27

*In re Relativity Media, LLC*, No. 18-11358,
   2018 Bankr. LEXIS 2037 (Bankr. S.D.N.Y. July 6, 2018) ..............................32

*Rohm and Haas Co. v. Am. Cyanamid Co.*,
   187 F. Supp. 2d 221 (D.N.J. 2001).................................................................28

*Skybell Techs., Inc. v. Ring, Inc.*,
   Case. No. 8:18-cv-14 (C.D. Cal. Sept. 18, 2018)..............................................33

*Sumitomo Corp. v. J.P. Morgan & Co., Inc.*,
   No. 99-cv-8780, 2000 WL 145747 (S.D.N.Y. 2000).........................................9

*Sunoco, Inc. (R&M) v. MX Wholesale Fuel Corp.*,
   565 F. Supp. 2d 572 (D.N.J. 2008).................................................................23

*Thorner v. Sony Computer Entert'm't Am., Inc.*,
No. 09-1894, 2009 WL 4041624 (D.NJ. Nov. 20, 2009) .................................. 25

*United States v. Jeffers*,
520 F.2d 1256 (7th Cir. 1975) ............................................................................ 9

*United States v. U.S. Gypsum Co.*,
333 U.S. 364 (1948) ........................................................................................... 6

*Wyeth v. Abbott Labs.*,
692 F. Supp. 2d 453 (3d Cir. 2010) ................................................................. 29

**Statutes**

28 U.S.C. § 636(b)(1)(A) .................................................................................... 6

35 U.S.C. § 101 ................................................................................................... 2

**Rules**

Fed. R. Civ. P. 72(a) ........................................................................................... 6

N.J. L. Civ. R. 72.1 ............................................................................................. 6

N.J. L. Civ. R. 7.2(a) ......................................................................................... 23

RPC 1.2 ................................................................................... 15, 8, 15, 16, 28

RPC 1.4 ............................................................................................................. 18

RPC 1.5 ............................................................................................................. 18

RPC 1.6 ............................................................................................................. 35

RPC 1.7 ............................................................................................................. 30

RPC 1.9 ..................................................................................................... *passim*

RPC 1.10 .................................................................................................... 28, 29

**Other Authorities**

*D.C. Bar Ethics Op.* No. 343 ................................................................. 12, 13, 14

*Restatement (Third) of the Law of Lawyering* (2000) ................................. 10, 11, 12

## I.    INTRODUCTION

Fish & Richardson P.C. ("Fish") represented Nasdaq, Inc. ("Nasdaq") for *thirteen years* as its intellectual property counsel, prosecuting some of the very patents at issue in this lawsuit and providing guidance and counseling to Nasdaq on many aspects of the electronic exchange technology field. After Fish was fired by Nasdaq, and without telling its former client or seeking its consent, Fish appeared as counsel *against* Nasdaq in a case involving some of the very patents it prosecuted. Fish's blatant attempt to switch sides on its former client plainly violates the rules of professional conduct, and Magistrate Judge Arpert properly held that disqualification was the "only" appropriate remedy in this unprecedented and brazen situation.

Fish's main argument is that it was allowed to switch sides on Nasdaq because of a "limited scope representation" agreement it signed with its new client, MIAX. Magistrate Judge Arpert correctly found Fish's conflict to be too pervasive to be "negated" by that piece of paper. After a careful analysis of the facts, and balancing MIAX's right to choose its counsel on one side of the scale and the need to maintain the integrity of the legal profession on the other, Judge Arpert found that disqualification was the "only remedy" that will prevent the "potential [that] Nasdaq's confidences and secrets" may be used against it in this litigation, given the "very substantial relationship" between the lawsuit and "Fish's prior

1

representation of Nasdaq." Memorandum & Order, Dkt. 105 ("Order") at 9-10.

In its appeal of the Order, Fish's recycled arguments provide this Court with no reason to deviate from or otherwise disturb Magistrate Judge Arpert's determinations, which are supported by detailed findings of fact and conclusions of law. The well-reasoned Order was neither clearly erroneous nor contrary to law; it should be affirmed.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Fish does not dispute the Order's recitation of facts relevant to Nasdaq's motion to disqualify. *See* Dkt. 107-1 at 1-7, 9 ("Here, the core facts on Plaintiff's Motion to Disqualify Fish were not in dispute."); Order at 6 ("The relevant facts here are generally not contested.").

### A.   The Current Lawsuit

Nasdaq, together with its wholly owned subsidiaries, Nasdaq ISE, LLC ("ISE") and FTEN, Inc. ("FTEN"), filed the lawsuit against MIAX on September 1, 2017, asserting seven counts of patent infringement and three counts of trade secret misappropriation. Dkt. 1.[1] MIAX is represented by two sets of counsel, Fish and Reed Smith, but it is clear that Fish was really in charge for MIAX, as reflected by MIAX's efforts to stay Fish's removal following disqualification and attempts to delay or adjourn case deadlines. Dkts. 106 & 108. After negotiating an

---

[1] Per the parties' stipulation, one of Nasdaq's counts for patent infringement against MIAX, Count III, was dismissed with prejudice on July 13, 2018. Dkt. 100.

extension to respond to the Complaint, MIAX filed a motion to dismiss under Fed. R. Civ. P. 12 on December 4, 2017, which, among other things, claimed that all seven patents-in-suit were invalid pursuant to 35 U.S.C. § 101. Dkt. 28-1. The single brief jointly filed by Fish and Reed Smith in support of MIAX's motion to dismiss attacked all of the patents in the case on virtually identical grounds, including those that Fish had previously prosecuted and won for Nasdaq. Briefing on MIAX's motion to dismiss closed on February 21, 2018, when the Court granted Nasdaq's motion for leave to file a sur-reply to address arguments MIAX raised for the first time in its reply brief. Dkts. 52 & 53. A Rule 26(f) conference was held on August 31, 2018, and a Rule 16 conference is currently scheduled for October 25, 2018. Discovery has not yet commenced, and MIAX is opposing all efforts to move forward with this case.

### B. Fish Served As Intellectual Property Counsel to Nasdaq For Thirteen Years and Prosecuted Four of the Seven Patents-in-Suit

Nasdaq and Fish had a longstanding professional working relationship that dates back to February 1998. In 2011, in Fish's own words, "Nasdaq fired FR." Dkt. 54-3. Over the course of thirteen years representing Nasdaq, Fish prosecuted patents on behalf of and provided intellectual property counseling and guidance to Nasdaq. Dkt. 73-1 at ¶¶3, 5.

When it moved to disqualify Fish, Nasdaq asserted seven patents against MIAX in this matter. Dkt. 1. Fish prosecuted four of the seven patents-in-suit, U.S.

Patent Nos. 7,933,827, 7,921,051, 7,747,506, and 7,599,875 (the "Nasdaq Patents"), to issuance. The Nasdaq Patents issued between 2009 and 2011, and are generally directed to electronic trading technology. Dkts. 54-4, 54-5, 54-6, 54-7. At least eight Fish attorneys were listed as counsel of record for these patents on the database maintained by the U.S. Patent and Trademark Office, *id.* at 54-8, 54-9, 54-10, 54-11, and most of those attorneys (Denis Maloney, Frank Gerratana, Jeffrey Barclay, Sean M. Dean, David Feigenbaum, and Timothy French) continue to practice at Fish today. Dkt. 54-1 at 3.

### C.    Fish Was Engaged by MIAX in This Matter To Be Materially Adverse to Nasdaq

Fish does not dispute that its representation of MIAX is materially adverse to Nasdaq. In fact, Fish admitted that "[t]he interests of MIAX are 'materially adverse' to those of ISE, FTEN, and NASDAQ: They are opposing parties in the same litigation." Dkt. 69 at 23. Prior to filing its notice of appearance, Fish did not raise the issue of its representation of MIAX in this matter with Nasdaq, and at no time has Fish asked Nasdaq for consent or a waiver as is required by RPCs 1.9 and 1.10. Dkt. 54-1 at 3. Instead, Nasdaq itself identified the conflict while reviewing the Nasdaq Patents in connection with MIAX's motion to dismiss, and raised the conflict with Nasdaq's outside counsel.

By letter dated December 20, 2017, Nasdaq's counsel informed Fish of its intention to seek Fish's disqualification based on Fish's prior representation of

Nasdaq under RPCs 1.9 and 1.10. Dkt. 54-12. On the same day, Nasdaq also sought assurances from Fish's co-counsel, Reed Smith, that it had not received any of Nasdaq's confidential information from Fish during its joint representation of MIAX. *Id.* at 54-13.

On January 4, 2018, Tracy Quinn at Reed Smith provided certification that Reed Smith did not receive any Nasdaq confidential information from Fish. *Id.* at 54-14. By letter dated January 5, 2018, however, Fish denied that its representation of MIAX in this matter presented any conflict because the limited scope representation agreement it had with MIAX "specifically excludes counts relating to" the Nasdaq Patents. *Id.* at 54-3. Fish also attempted to persuade Nasdaq that it had undertaken measures to inoculate itself against the conflict by screening every Fish lawyer who has represented Nasdaq and walling off its entire Boston office from participation in the case. *Id.*

However, given MIAX's litigation strategy, which Magistrate Judge Arpert correctly found to be "necessarily a collaborative effort" between Fish and Reed Smith, Fish's prophylactic efforts are woefully deficient. Order at 10. To illustrate using one example, in an effort to avoid discovery into MIAX's wrongdoing, the motion to dismiss filed by MIAX was on the grounds that the patents Nasdaq asserted against MIAX, including each of the Nasdaq Patents, were invalid on their face, Dkt. 28-1, even though MIAX's own lawyers at Fish prosecuted most of

these patents at the USPTO, arguing *in favor* of their validity when they represented Nasdaq.

When Fish did not voluntarily withdraw from the case by the February 26, 2018 deadline Nasdaq imposed on Fish, Dkt. 54-15, Nasdaq filed its motion for disqualification that same week. Dkt. 54-1. Magistrate Judge Arpert issued the Order disqualifying Fish on September 6, 2018, Dkt. 105, and Fish now appeals the Order to the Court pursuant to L. Civ. R. 72.1(c). Dkt. 107-1.

## III.   LEGAL ARGUMENT

### A.   Standard of Review

A district court may reverse a magistrate judge's order only if it finds the ruling to be "clearly erroneous or contrary to law." *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); L. Civ. R. 72.1(c)(1)(A). The district court is bound by the clearly erroneous rule as to findings of fact; the phrase "contrary to law" indicates plenary, or de novo, review as to matters of law. *See Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 91 (3d Cir. 1992). According to the Supreme Court, "a finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). However, "the reviewing court will not reverse the Magistrate Judge's determination even if the court might have decided the matter differently." *Bowen*

*v. Parking Authority of City of Camden*, No. 00-5765, 2002 WL 1754493, at *3 (D.N.J. July 30, 2002) (citing *Cardona v. General Motors Corp.*, 942 F. Supp. 968, 971 (D.N.J. 1996)).

In reviewing a magistrate judge's factual determinations, a district court may not consider any evidence which was not presented to the magistrate judge, which evidence and arguments are deemed waived. *Id.*; *see Haines*, 975 F.2d at 92. In deciding a disqualification motion, courts must "balance competing interests [by] weighing the need to maintain the highest standards of the profession against a client's right freely to choose his counsel." *City of Atlantic City v. Trupos*, 201 N.J. 447, 462 (2010). In weighing these factors, the court must be mindful that any "doubts are to be resolved in *favor* of disqualification." *Carlyle Towers Condominium Ass'n, Inc. v. Crossland Sav., FSB*, 944 F.Supp. 341, 345 (D.N.J. 1996) (emphasis added); *Reardon v. Marlayne, Inc.,* 83 N.J. 460, 471 (1980) ("[A]ny doubt as to the propriety of an attorney's representation of a client . . . must be resolved in favor of disqualification" to ensure the protection of client confidences.); *Carreno v. City of Newark*, 834 F. Supp. 2d 217, 225 (D.N.J. 2011). Magistrate Judge Arpert faithfully heeded these directives. Order at 6.

### B.    Fish's Limited Scope Representation Argument is Unavailing

Magistrate Judge Arpert was correct to reject Fish's attempt to bypass the application of RPC 1.9(a)'s "substantial relationship" test by using a "limited

scope representation" agreement designed to circumvent Fish's unavoidable ethical conflict. Order at 7 ("The central question before the Court is whether this representation arrangement sufficiently negates the conflict in this case. Under the specific facts in this case, the Court finds that it does not.").

### 1.   A Limited Scope Representation Does Not Work to Immunize the Conflict at Hand

Fish asserts that "lawyers and clients [may] limit their engagement agreements so as to avoid conflicts" and complains that Magistrate Judge Arpert acted contrary to law when the Order "fail[ed]" to discuss the "express authority" Fish submitted for that proposition. Dkt. 107-1 at 17. Fish also faults Judge Arpert for "fail[ing] even to cite to RPC 1.2(c)" in the Order, suggesting that the omission of this made-up "central feature" in a disqualification order is itself reversible error. *Id.* However, Fish submitted neither controlling nor persuasive authority endorsing its self-serving proposition. Both Fish's opposition brief (Dkt. 69) and appeal brief (Dkt. 107-1) are ***devoid of a single case in history*** where a limited scope arrangement negated a conflict of this magnitude.

The only New Jersey or Third Circuit case cited by Fish, *Cafaro v. HMC Int'l, LLC*, No. 07-cv-2793, 2012 WL 4857763, at *6 (D.N.J. Oct. 11, 2012), is inapposite because it does not involve any circumscribed retention agreements. Unable to admit defeat, Fish proceeds to cite opinions from the courts of other states, but those are equally distinguishable. The *Buysse v. Baumann-Furrie & Co.*

case was decided under Minnesota law, and the trial court declined to order disqualification there only on account of the "balanc[e] of the equities," finding that "[a]t this late date," it would have caused "a severe hardship on the judgment creditors to deny them their chosen counsel." 448 N.W.2d 865, 869 (Minn. 1989). *Sumitomo Corp. v. J.P. Morgan & Co., Inc.*, No. 99-cv-8780, 2000 WL 145747 (S.D.N.Y. 2000), likewise misses the mark because the concurrent adverse representation there was evaluated under Canon 5 of New York's Code of Professional Responsibility, which finds disqualification to be appropriate "only . . . where the attorney's conflict undermines a court's confidence in the vigor of the attorney's representation of his client." *Id.* at *4. In *United States v. Jeffers*, 520 F.2d 1256 (7th Cir. 1975), a criminal ineffective assistance of counsel case involving conspiracy to distribute drugs, the trial court did not find an overly cautious defense attorney to be conflicted because one of the government's witnesses was his client in a previous, unrelated homicide case.

Likewise, the Enron bankruptcy case cited by Fish is distinguishable outright because, under New York law, the use of "conflicts counsel, limited engagement agreements, and ethical walls" are "customary" in "large bankruptcy cases" where conflicts are all but unavoidable. *In re Enron Corp.*, No. 01-16034, 2002 WL 32034346, at *10-11 (Bankr. S.D.N.Y. 2002). Finally, the facts in *Milwaukee Elec. Tool Corp. v. Hilti, Inc.* are the direct opposite of the facts in this case. No. 14-cv-

9

1288, 2015 WL 1898393 (E.D. Wis. 2015). There, a third-party intervenor sought the disqualification of plaintiffs' counsel, DLA Piper, in seven out of the eight cases filed because it was a current client of firm. *Id.* at *1. Because DLA Piper did not appear for the plaintiffs in the eighth case filed against the intervenor-movant, the court declined to disqualify DLA Piper because there was no "direct adversity" in that case. *Id.* at *3. The *Multimedia Patent Trust v. Apple, Inc.* case is distinguishable on the same basis because a non-party sought, and was denied, the disqualification of plaintiff's counsel. No. 10-cv-2618, 2011 WL 1636928 (S.D. Cal. 2011).

Because Fish could not identify any judicial authority from New Jersey, or even the Third Circuit, it attempts to support its position by citing to the *Restatement (Third) of the Law of Lawyering* and ethics opinions from the bars of the District of Columbia and New York. Upon closer scrutiny, however, these non-judicial sources actually undermine Fish's argument.

The crux of Fish's argument is an illustration in the *Restatement (Third) of the Law of Lawyering* (2000). Dkt. 107-1 at 11-12. Section 121, comment c(iii), of the *Restatement* notes that "some conflicts can be eliminated by an agreement limiting the scope of the lawyer's representation if the limitation can be given effect without rendering the remaining representation objectively inadequate." *Id.* at 11. Yet, in Illustration 4 (cited by Fish, *see id.* at 12), the sample retention

agreement that the Lawyer executes with a new Client to avoid a conflict with Manufacturer, also a client of Lawyer, demonstrates the insufficiency of Fish's limited scope representation for conflicts purposes.[2] *Restatement*, § 121 comment c(iii). To eliminate Fish's conflict, Restatement § 121 would require Fish (Lawyer) to craft a representation agreement that avoids <u>all</u> disputes involving both MIAX (Client) and Nasdaq (Manufacturer)—it would not have allowed Fish to represent MIAX at all if Nasdaq is on the other side. *See id.* That is exactly the opposite of what Fish is trying to do here.

Fish also relies on *Restatement* § 132, comment e, as authority permitting a lawyer to "limit the scope of representation to a later client so as to avoid representation substantially related to that undertaken for a previous client." Dkt. 107-1 at 11. Fish neglects to acknowledge, however, that comment e explicitly warns that: "[a] later representation is <u>prohibited</u> if the second client's interests are materially adverse to those of the former client" and "[t]he scope of a client's interests is normally determined by the scope of work that the lawyer undertook in

---

[2] *Restatement*, § 121, ill. 4: A new Client retained Lawyer in "general business matters." New Client has a distribution contract with Manufacturer, who Lawyer also represents "in local real-estate matters completely unrelated to Client's business." *Restatement*, § 121 comment c(iii). To avoid a conflict, Lawyer limits "[a]n agreement between Lawyer and Client [MIAX] [so] that the scope of Lawyer's representation of Client ***will not extend*** to dealing with disputes with Manufacturer [Nasdaq]." *Id.* (emphasis added). Thus, the Lawyer refused to meddle in *any and all* disputes between the new Client and the Manufacturer—not only disputes arising out of the "distribution contract" or matters involving "local real estate." *Id.*

the former representation." *Restatement*, § 132 comment e. Applying these principles, Magistrate Judge Arpert correctly found that Fish's representation of MIAX is prohibited because MIAX's interests in invalidating Nasdaq's patents in the current litigation are adverse to Nasdaq's interests in obtaining a judgment of infringement and not-invalidity for the asserted patents, including those Fish previously prosecuted.[3] Order at 9. Indeed, the rationale underlying "the prohibition against switching sides in a matter is basic and longstanding. The obligation to represent the client with undivided fidelity and not to divulge its secrets or confidences forbids the subsequent acceptance of employment from others in matters adversely affecting <u>any interest</u> of the client with respect to which confidence has been reposed." *Restatement*, § 132 comment b; *see also* Order at 9-10.

Fish also relies heavily on *D.C. Bar Ethics Opinion* No. 343, but the opinion belies Fish's argument that its "joint representation" of MIAX with Reed Smith is sufficient to help eliminate its conflict of interest. Dkt. 107-1 at 12-14. The ethics opinion permits, "[s]ubject to certain conditions, a lawyer [to] limit the scope of the new representation such that factual information normally obtained in the prior

---

[3] In addition, Illustration 5 (cited by Fish at Dkt. 69 at 13) reinforces the rule that a lawyer cannot represent a later client (Client B) if that work is substantially related to the lawyer's work for the former client (Client A) (*i.e.* in obtaining FDA approval for a drug X for treating diseases of the eye) and therefore might adversely affect the former client (*e.g.* "significantly reduc[e] the profitability of Client A's drug X"). *Id.*

matter would be legally irrelevant to the advancement of the current client's position in the new matter." *D.C. Bar Ethics Op.* No. 343. But the specific patent litigation-related example of a properly circumscribed representation has the "Lawyer inform[] Client [MIAX] that she cannot participate in the patent infringement action against Company [Nasdaq] but that she could represent Client on the limited question [of] whether Client's own patent had been properly assigned to it." *Id.* In other words, the Lawyer declined to be adverse to Company in an infringement suit, urged the "Client [to] hire other lawyers to prosecute its infringement claims" against Company, and limited her representation to providing a legal opinion about the "threshold legal issue" of standing to sue on a patent. *Id.* Lawyer declined to be adverse to its former client Company ***even though*** the former matter was a "different patent infringement case involving the same underlying technology." *Id.* In contrast, here, Fish is not limiting its representation to a threshold or collateral issue in the case, but rather it is going whole hog, even serving as lead counsel on trade secret claims advanced by its former client in the same technological field as the intellectual property that Fish once helped Nasdaq secure. *D.C. Bar Ethics Opinion* No. 343 makes clear that where a lawyer represented a former client in a patent infringement case relating to the same underlying technology, the lawyer would ***not*** be able to represent a new client in litigation involving patents against that former client, even if it were on different

13

patents. *See id.* ("[T]hat Lawyer must ensure that her participation in the case *never extends to the patent infringement issues*.") (emphasis added).

Applying the principles illustrated in the example, Fish's limited scope representation would only be permissible here if it had nothing to do with a case involving any patent infringement claims involving the same underlying technology as the patents Fish prosecuted on behalf of Nasdaq, or if the representation was limited to a discrete, pre-litigation issue not involving any claims of infringement by either MIAX or Nasdaq. Fish heeded neither restriction here. Indeed, if anything, *D.C. Bar Ethics Opinion No.* 343 serves as a reminder that having a limited scope representation does not automatically sever the "substantial relationship" tie between former and current matters:

> We are mindful of the Court of Appeals' admonition . . . that even if a lawyer sincerely believes that his or her representation "could be insulated, factually and ethically," from the earlier representation, the belief might be mistaken. In that case, "[t]he 'substantially related' test by its terms, . . . is meant to induce a ... lawyer considering a representation to err well on the side of caution."

*See id.* If a lawyer had acquired confidential information in representing a former client that can be used against the client in a subsequent adverse representation, then the matters are "substantially related" and the lawyer must be disqualified. *Trupos*, 201 N.J. at 467.

Given that none of Fish's purported "express authority" is on point,

14

Magistrate Judge Arpert's determination that Fish's limited "representation arrangement [does not] sufficiently negate[] the conflict in this case" is not contrary to law. Order at 7.

### 2.    RPC 1.2(c) Cannot Be Used to "Cure" Fish's Conflict

The language of RPC 1.2(c) itself also demonstrates that Fish's argument— i.e., that its use of a limited scope representation is a per se "cure" of a RPC 1.9(a) conflict—is misplaced. RPC 1.2(c) permits lawyers to "limit the scope of the representation" with clients so long as the "limitation is reasonable under the circumstances" and the client gives "informed consent." Neither of these conditions are satisfied in this case. Therefore, this provision is plainly inapplicable here.

The text and context of RPC 1.2(c) are devoid of any reference to ethical conflicts under RPCs 1.9 and 1.10, or RPC 1.2's ability to inoculate a firm from conflicts. Instead, case law—even those cited by Fish—demonstrates that RPC 1.2(c)'s purpose is to curtail legal malpractice actions by delineating the parameters of a legal representation at the outset, subject to a reasonableness requirement and the client's informed consent. *See* Dkt. 107-1 at 11.

*Lerner v. Laufer*, 359 N.J. Super. 201, 217 (App. Div. 2003), and *Fitzgerald v. Linnus*, 336 N.J. Super. 458, 470 (App. Div. 2001), are completely silent as to the propriety of limited scope representation agreements in the context of attorney

disqualification. *See id*. In fact, *Lerner* was a legal malpractice action in which the attorney argued that RPC 1.2(c) provided him with a shield against his divorce client's claim that he breached the standard of care in not conducting certain discovery in the underlying divorce proceeding. *Lerner*, 359 N.J. Super. at 217 (The court is "satisfied that [attorney] Laufer, with [client] Lynne's consent after consultation, properly limited the scope of his representation of her under RPC 1.2(c), to a review of the terms of the mediated agreement without going outside its four corners."). The Appellate Division found that the attorney did not breach the duty of care, "reject[ing] the argument that . . . Laufer stepped from under the protection of his limited scope representation and became fully liable as if no such limitation existed." *Id.* at 218-19.

Similarly, in *Fitzgerald*, Rule 1.2(c) likewise shielded attorney Linnus from malpractice liability—not disqualification. *Fitzgerald*, 336 N.J. Super. at 470. There, the Appellate Division cited to Rule 1.2(c) in finding that the attorney "owed no duty to plaintiffs" outside of being "retained . . . specifically to administer [the] decedent's estate." *Id.* at 470, 474.

Contrary to Fish's argument, RPC 1.2(c) and the cases cited by Fish do not stand for the proposition that a limited scope representation is a panacea to ethical conflicts involving a former client. Dkt. 107-1 at 11.

**C.    The Magistrate Judge Was Correct Not to Divide the Instant Lawsuit into Two Distinct "Matters" For Conflicts Purposes**

Fish challenges Magistrate Judge Arpert's determination that "this litigation should be considered as a whole for the purposes of the ethical issues raised here and not as distinct, unrelated parts" was legal error. Dkt. 107-1 at 10; Order at 7. However, Fish does not explain why or how its attempt to redefine "matter" as that term is used in RPC 1.9(a) is legally supported. *See* Dkt. 107-1 at 10-11. Nor has Fish submitted any evidence or argument in either its opposition brief (Dkt. 69) or appeal brief (Dkt. 107-1) for why the Court must treat individual claims in this lawsuit as discrete "matters" under RPC 1.9(a) in evaluating an ethical conflict.

In contrast, Magistrate Judge Arpert carefully explained the reasoning behind the finding:

> [D]espite MIAX's attempts to break down the individual claims in this case into discrete 'matters' for conflicts purposes, this is a single lawsuit. Plaintiffs are related entities, their claims are contained in a single Complaint, and this matter is proceeding as a single action. The seven asserted patents and the alleged trade secrets involve the same general field of technology, and the accused instrumentalities are the same for all the patent infringement claims. Indeed, notwithstanding its dual representation and its contention that this case is comprised of discrete parts, MIAX elected to file a single motion to dismiss in response to the Complaint. Given the related nature of all the issues in the case, the Court finds that this litigation should be considered as a whole for the purposes of the ethical issues raised here, and not as distinct, unrelated parts.

Order at 7.

17

In rendering his conclusion, Judge Arpert relied on Nasdaq's submissions and evidence on the issue, which is abundant in the record. *See, e.g.*, Dkt. 54-1 at 9-13 and Dkt. 73 at 9-11. Specifically, Nasdaq asserted seven counts of patent infringement and three counts of trade secret misappropriation in a single lawsuit against MIAX, filed on September 1, 2017. *Id.* at 2; Dkt. 1. The seven patents-in-suit share the same subject matter (electronic trading technology) and are infringed by the same accused products and services (MIAX's electronic trading platforms). Dkt. 54-1 at 11. The asserted trade secrets concern the same field of technology as the patents-in-suit. Dkt. 73-1 at ¶¶5-8. Fish received confidential information relating to both forms of intellectual property from its representation of Nasdaq over the course of thirteen years. *Id.* at ¶¶7-8, 11-12. Moreover, despite assuring Nasdaq that Fish's representation of MIAX specifically excludes the Nasdaq Patents, ***Fish and Reed Smith opted to file a single motion to dismiss all counts in Nasdaq's complaint: MIAX's brief included invalidity arguments that did not differ from patent to patent and serves as prima facie evidence of Fish and Reed Smith's "collaborative effort" in representing MIAX against Nasdaq.*** Dkt. 54-1 at 10; *see* Order at 10.

Nasdaq also submitted persuasive authority to the Court in arguing for the correct definition of a "matter" for conflicts purposes, *see* Dkt. 73 at 9-11 & n.7, to which Fish never responded. To wit, the term "matter" as used contextually in RPC

18

1.2(a), 1.4(b), 1.5, 1.7(b), and 1.9(a) all refer to a "case," "controversy," or "litigation"—not a subset of causes of action within a case cherry-picked to suit Fish's own purposes. *Id.* at 9 & n.7. Consistent with the RPC's usage of "matter," the Michels treatise, which Fish itself cited in its briefing, defines "matters" to be "cases." *Id.* at n.7 (citing Kevin H. Michels, *New Jersey Attorney Ethics—The Law of New Jersey Lawyering* § 21:4 at 554 (2011) ("the matters themselves—the cases—must be substantially related")).

Fish has altogether failed to rebut any of the foregoing in its briefing submitted to the Court. Because Fish has provided the Court with no basis to vacate or deviate from the conclusions drawn by Magistrate Judge Arpert, and because in any event Judge Arpert's determinations are not contrary to law, the Court should affirm these well-supported determinations.

### D. Magistrate Judge Arpert Correctly Found Fish's Disqualification to be Warranted Under *Trupos'* "Substantially Related" Test

#### 1. Nasdaq Was Indisputably a Former Client of Fish

Fish takes issue with the Magistrate's "former client" finding based on a misreading of a single case—*Ford Motor Co. v. Edgewood Props., Inc.*, No. 06-cv-1278, 2011 WL 5080347 (D.N.J. 2011)—to require that Nasdaq's co-plaintiffs, ISE and FTEN, must have also been former clients of Fish. Fish argues that because neither ISE nor FTEN were ever clients of Fish, Nasdaq cannot meet its burden on disqualification. Dkt. 107-1 at 20-22. Fish is legally mistaken.

19

The *Ford* case, which is the sole case Fish relies on for the proposition that "[i]n deciding whether moving parties were former clients under RPC 1.9, the Court looks to whether the lawyer had an attorney-client relationship with e*ach entity*," *id.* at 21 (emphasis added), held no such thing. The *Ford* decision is actually a consolidated decision rendered in and applying to two separate, but related cases: In one case, dubbed the "Ford Action," Ford was the plaintiff against Edgewood Properties, and in the second case, called the "JSM Action," Ford was the defendant against *eight plaintiffs*, including JSM Properties and WWM Properties. 2011 WL 5080347, at *1 & n.2 (citing two dockets to two actions arising out of "the demolition of a Ford assembly plant in Edison, New Jersey"). Both Edgewood and WWM filed motions to disqualify Ford's law firm, LeClair Ryan, under RPC 1.9. *Id.* (explaining that there were two separate motions to disqualify the LeClair Ryan firm pending in the two cases). For efficiency, and because "the parties filed the same materials in support of and in opposition to the Motion in both the *Ford* and *JSM* Actions," the Court consolidated the motions and issued a single opinion disqualifying Ford's counsel, the LeClair Ryan firm. *Id.* & n.1.

In *Ford*, when the court found "that WWM and Edgewood satisfy the first prong of 1.9(a)" because they were each "former clients" of the disqualified attorney, the court did not impose a requirement that all *eight plaintiffs* in the JSM

20

lawsuit in which WWM is a co-plaintiff had to be "former clients" of the disqualified attorney. *Id.* at *4. Rather, in "look[ing] to whether Mr. Kosch had an attorney-client relationship with *each entity*," the court was referring to both Edgewood Properties in the first action against Ford, and WWM Properties, as one of eight plaintiffs against Ford, in the second case. Fish's intentional misreading of *Ford* to require that somehow, in bringing a disqualification motion under RPC 1.9, the movant must establish that all of the parties on one side of the litigation must have had an attorney-client relationship with the lawyer whose disqualification is sought, should be rejected. Indeed, *Ford* did not require WWM to show that any of its seven co-plaintiffs in the lawsuit had an attorney-client relationship with Mr. Kosch. *Id.* at *4-5.

Accordingly, the fact that "neither ISE nor FTEN were ever 'clients' of Fish" is not an issue germane to the disqualification inquiry at hand. Dkt. 107-1 at 21. Nor is the fact that Fish was adverse to ISE in a previous litigation relevant to Nasdaq's motion to disqualify. *Id.* at 2, 21. The only thing that matters is whether Nasdaq is a former client of Fish—and Magistrate Judge Arpert's conclusion that it undisputedly was, because "Fish represented Nasdaq with respect to intellectual property matters from 1998 until 2011, during which time Fish prosecuted many patents on behalf of Nasdaq, including the four patents that Nasdaq is asserting in the present case," is sound and supported by fact. Order at 2; *see also id.* at 7

("Although it terminated approximately six years ago, an attorney-client relationship existed between Fish and Nasdaq for over a decade.").

### 2. Magistrate Judge Arpert Correctly Found a "Very Substantial Relationship Between This Matter and Fish's Prior Representation of Nasdaq"

Fish acknowledges the *Trupos* test for determining whether matters are deemed to be "substantially related" under RPC 1.9(a).[4] Curiously, Fish's disagreement with the Order is apparently limited to just one aspect of the Magistrate Judge's Order, his "summar[]y observ[ation] that . . . the prior NASDAQ patent work and the current NASDAQ trade secret claims share similar subject matter." Dkt. 107-1 at 24. Fish's dissatisfaction is a red herring, because Magistrate Judge Arpert's finding that there is a substantial relationship between the two matters is not based on a single "summary observation."

The Magistrate Judge correctly found that sufficient facts support a finding that both prongs of the *Trupos* test are met. Under the first prong, Judge Arpert found that Fish's provision of intellectual property counseling advice and guidance to Nasdaq over the course of thirteen years put Fish in the privileged position of receiving confidential information relating to Nasdaq's intellectual property. Order

---

[4] Matters are "substantially related" if: (1) the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent matter, *or* (2) facts relevant to the prior representation are both relevant and material to the subsequent representation. Dkt. 107-1 at 23-24 (citing *Trupos*, 201 N.J. at 467).

at 7-8 (citing Dkt. 73-1 at ¶8).[5] The Order recited that even today, Fish not only possesses information relating generally to Nasdaq's patent prosecution strategy and approach to defending the validity of its patents, but also what Nasdaq protected as trade secrets apart from its patented inventions in the electronic trading technology field. *Id.* at 8. Moreover, Judge Arpert held that because "Fish prosecuted the Nasdaq Patents asserted in this case . . . there is no doubt that during the course of the relationship Fish obtained confidential information that is likely to bear upon the present dispute between Nasdaq and MIAX," which is focused precisely on technological improvements made to the electronic trading technology field. *Id.* (citing *Essex Chem. Corp. v. Hartford Ac. & Indemn. Co.*, 993 F. Supp. 241, 246 (D.N.J. 1998) (where the matters are substantially related, "the court will presume that the attorney has acquired confidential information from the former

---

[5] Fish objects that the Magistrate Judge's consideration of the Simonsson Declaration at Dkt. 73-1 was improper because, as Fish alleges, paragraph 6 in the declaration employed the phrase "I am informed and aware." Dkt. 107-1 at 25 (identifying Dkt. 73-1 at ¶ 6). Fish fails to point out that Judge Arpert does not rely on that paragraph in rendering the Order. Nor does Fish's citation to L. Civ. R. 7.2(a) (which disallows affidavits not based on "personal knowledge," or that which include "legal arguments" and "summations") or the *Sunoco* case help its argument. *Id.* at 25. Unlike here, where the declaration came from a Nasdaq employee, the ***attorney*** certification in *Sunoco* was stricken because it did "not provide facts within the personal knowledge of the affiant" sufficient to "show[] a genuine issue for trial" on a motion for partial summary judgment. *Sunoco, Inc. (R&M) v. MX Wholesale Fuel Corp.*, 565 F. Supp. 2d 572, 575-76 (D.N.J. 2008). In addition, the Simonsson Declaration does not violate Local Rule 7.2(a) because it is, in fact, based on Mr. Simonsson's personal knowledge of the professional working relationship between Nasdaq and Fish. *See* Dkt. 73-1 at ¶¶1-4.

client.") and *Audio MPEG, Inc. v. Dell, Inc.*, 219 F. Supp. 3d 563, 569 (E.D. Va. 2016) ("It is well settled that once an attorney-client relationship has been established, an irrebuttable presumption arises that confidential information was conveyed to the attorney in the prior matter.")).

Accordingly, the Magistrate Judge concluded that both prongs of the "substantially related" test are met, because the Nasdaq confidential information in Fish's possession, which Fish received in the course of its previous representation of Nasdaq over thirteen years, is likely to "bear[] not only on issues in this case related to the Nasdaq Patents, but also on the other patent and trade secret issues in this case, as they share similar subject matter." Order at 8. The Magistrate Judge then made a "factual reconstruction of the scope of [Fish's] legal representation[s]," *specifically* pointing out that the knowledge Fish acquired about "Nasdaq's patent prosecution strategies, . . . the intended meaning and scope of each of the patented claims, their potential to be infringed, and facts regarding validity and enforceability" are "both relevant and material" and could be used against Nasdaq in the current matter involving Nasdaq's patents and trade secrets. *Id.* at 8-9.

Fish protests that it itself "had no involvement with representing NASDAQ on any issue related to the[] alleged trade secrets" in the Complaint, Dkt. 107-1 at 3, and suggests that this self-serving attorney argument operates to sever the nexus

between Fish's prior patent prosecution work for Nasdaq and the current matter involving Nasdaq patents and trade secrets. But Fish's bald assertion is controverted by the facts contained in the Simonsson Declaration, attesting to how Fish's work for Nasdaq bears on both Nasdaq's patent strategy and what Nasdaq elected to protect as trade secrets apart from its patent portfolio, which the Order credits several times. Order at 7, 8 (citing Dkt. 73-1). Thus, Magistrate Judge Arpert correctly found a substantial relationship to exist between the subjects of Fish's former representation of Nasdaq and Fish's current representation of MIAX against Nasdaq. *Id.*; *Thorner v. Sony Computer Entertm't Am., Inc.*, No. 09-1894, 2009 WL 4041624 (D.NJ. Nov. 20, 2009) (Arpert, J.) (disqualifying plaintiff's counsel "[n]otwithstanding Plaintiffs' attempt to create the impression that the substance of [attorney's] prior representation of [Defendant] was entirely unrelated to the instant litigation, it is clear that those matters were more than tangentially related to Plaintiffs' present claims."); *Cardona*, 942 F. Supp. At 973 ("[D]isqualification is proper when the similarity in the two representation is enough to raise a common-sense inference that what the lawyer learned from his former client will prove useful in his representation of another client whose interests are adverse to those of the former client.").

After marching through the various facts and findings, Magistrate Judge Arpert concludes, "applying *Trupos*, . . . this lawsuit, as a whole, [is] 'substantially

25

related' to Fish's earlier representation of Nasdaq." *Id.* at 9 (citing *Trupos* 2-prong test for substantial relationship). Fish contends that the Magistrate Judge's findings here are "unsubstantiated," "purely superficial," and "vague[]". Dkt. 107-1 at 27. But Fish failed to even rebut the evidence and case law put forth by Nasdaq which support Judge Arpert's conclusion that Fish's decade-plus IP counseling and prosecution work for Nasdaq allowed Fish to gain access to confidential information and facts that can be used to Nasdaq's detriment in its case against MIAX. *See* Dkt. 73 at 9-11 & n.11; *Kaselaan & D'Angelo Associates, Inc. v. D'Angelo*, 144 F.R.D. 235, 239 (D.N.J. 1992) (finding disqualification to be appropriate because the "adversity between the interests of the attorney's former and present clients has created a climate for disclosure of relevant confidential information"); *id.* at 240-41 (finding attorney's longstanding relationship with former client to favor disqualification because the various confidences gained there "could be used to the substantial disadvantage of his former client . . . even though such general information may not have been specifically relevant to the merits of the [subsequent] dispute"); *Asyst Techs., Inc. v. Empak, Inc.*, 962 F. Supp. 1241, 1242 (N.D. Cal. 1997) ("Few people are more likely to have confidential information with which to attack the validity of a patent than the lawyers who prosecuted it.").

Fish next belabors an argument that it first raised on sur-reply to Nasdaq's

26

motion to disqualify, Dkt. 80, this time using it to criticize Judge Arpert for overlooking the point that "the passage of time" may be "a highly relevant perhaps even determinative factor" in those situations where the alleged confidences involve 'changes in technology.'" Dkt. 107-1 at 28. But Fish intentionally hides the fact that in the *Reardon v. Marlayne* case it cites, the disqualification of plaintiffs' counsel was ultimately ***affirmed*** by the Supreme Court because, despite the two-year period between the former and client representations, the Court could ***not*** find that the "passage of time so dilute[d] the significance of the confidences . . . ***given the overwhelming substantial relationship*** between the issues here." 83 N.J. at 476. Accordingly, because the very same patents which Fish prosecuted on behalf of Nasdaq have been asserted in this litigation against Fish's new client, MIAX, it was neither legally erroneous nor contrary to law for the Magistrate Judge to find that there was a "very substantial relationship" between the two matters despite the passage of time. Order at 10.

Finally, Fish's objections to Judge Arpert's "substantially related" findings based on ISE and FTEN not being former clients of Fish are dead on arrival. Dkt. 107-1 at 23, 29, 30. As the single case that Fish itself cited in its briefing makes clear, there is no requirement that all of the co-plaintiffs in this case must have been former clients of Fish for Nasdaq to succeed on a motion to disqualify pursuant to RPCs 1.9 and 1.10. *See Ford*, 2011 WL 5080347, at *1-3.

27

### 3.    Fish Does Not Contest the "Materially Adverse" Finding

Fish does not challenge Magistrate Judge Arpert's finding that "the interests of Nasdaq and MIAX, as opposing parties in this lawsuit, are 'materially adverse.'" Order at 9. Fish does not discuss the "materially adverse" requirement in its brief, except to assert, in passing, that "Fish has taken appropriate measures under *RPC* 1.2(c) to ensure that it is not adverse to NASDAQ." Dkt. 107-1 at 22.

But here Fish is attempting to turn the "materially adverse" requirement on its head, using circular reasoning to argue that because Fish attempted to circumvent its conflict with a limited scope representation of MIAX, it cannot be considered "materially adverse" to Nasdaq even though it represents MIAX against Nasdaq in the underlying lawsuit. That argument flies in the face of the law of this Court, which found that the requirement is met when parties are on opposite sides of a matter. *See* Dkt. 73 at 12; *Rohm and Haas Co. v. Am. Cyanamid Co.*, 187 F. Supp. 2d 221, 228 (D.N.J. 2001) (finding adversity because the same firm is representing its current client against a former client).

### 4.    Fish Gives No Reason to Disturb Magistrate Judge Arpert's "Imputation" Finding

Fish ascribes "error" to the Magistrate Judge's imputation finding, Order at 4, 9, by calling it the imputation of a "non-existent conflict." Dkt. 107-1 at 31. Yet, Fish gives no reason whatsoever for the alleged error. By Fish's own words (or lack thereof), Magistrate Judge Arpert's RPC 1.10(a) determination is

28

necessarily dependent upon his finding there to be a conflict under RPC 1.9(a), and should be left undisturbed unless the Court does not affirm the Magistrate Judge's determinations under RPC 1.9(a).

Fish also does not dispute the automatic application of imputation once a violation of RPC 1.9(a) is found, nor can it. Imputation is mandated by RPC 1.10(a).[6] *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 217 (1988) (The New Jersey Supreme Court has found that RPC 1.10(a) "applies a *per se* rule of imputed disqualification to lawyers currently practicing together in close association, without regard to whether there has been an actual sharing of client confidences."). Thus, if the Court were to affirm the Magistrate Judge's finding of a conflict under or a violation of RPC 1.9(a), RPC 1.10(a)'s application is automatic. Here, there is no doubt that Fish "knowingly" represented a new client in contravention of RPC 1.10(a), when Fish attempted to sidestep its RPC 1.9(a) conflict by crafting a limited scope representation agreement, and when at least six of Fish's currently practicing attorneys would have been prohibited from representing MIAX under RPC 1.9(a). *See* Dkt. 69-5.

### E.   The Magistrate Judge Was Within His Discretion to Find That the Balance of the Equities Tip in Favor of Disqualification

In a last-ditch effort to overturn Magistrate Judge Arpert's Order, Fish cites

---

[6] RPC 1.10(a) states: "When lawyers are associated in a firm, none of them **shall** knowingly represent a client when any one of them practicing alone would be prohibited from doing so by . . . RPC 1.9."

to *Wyeth v. Abbott Labs.*, 692 F. Supp. 2d 453, 459 (3d Cir. 2010) for the proposition that the Court must march through a "twelve factor" analysis before Fish can be disqualified. Dkt. 107-1 at 32-38. Not only is the "twelve factor" analysis not required, *see Carreno*, 834 F. Supp. 2d at 225 (ordering disqualification without such analysis), but Fish also hides the fact that the latter six factors are actually irrelevant to this case because Nasdaq has not alleged a concurrent conflict under RPC 1.7. *Id.* (enumerating six *Carlyle Towers* factors to be relevant for a disqualification analysis and six additional factors "in this case to address the . . . concurrent representation" conflict under RPC 1.7). A court enjoys wide discretion to structure the balancing inquiry however it desires. *Id.*

Even then, in ordering Fish's disqualification, Magistrate Judge Arpert dutifully "balance[d] competing interests, weighing the need to maintain the highest standards of the profession against a client's right freely to choose his counsel." Order at 6, 9-10. In weighing this balance, the Magistrate Judge was also mindful that any doubts as to the propriety of an attorney's representation of a client must be resolved in favor of disqualification. *Id.* at 6 (citing *Carlyle Towers*, 944 F.Supp. at 345).

"The question of whether disqualification is appropriate is committed to the sound discretion of the district court[.]" Order at 5. The Magistrate Judge's finding that Fish's disqualification from this case is "the most appropriate manner by

30

which to enforce . . . RPCs 1.9 and 1.10" should not be disturbed. *Id.* at 9; *Cooper Hosp./Univ. Med. Ctr. v. Sullivan*, 183 F.R.D. 119, 127 (D.N.J. 1998) ("Where a magistrate judge is authorized to exercise his or her discretion, the decision will be reversed only for an abuse of that discretion.").

Identifying RPC 1.9's purposes as (1) to "prevent even the potential that a former client's confidences and secrets may be used against him," (2) to "maint[ain] public confidence in the integrity of the bar," and (3) to safeguard a client's expectation of continued loyalty from his lawyer, Magistrate Judge Arpert found that "disqualification is the only remedy" to further these purposes in this case. *Id.* at 9-10 (citing *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 162 (3d Cir. 1984)). Indeed, judging from a policy, fairness, and prejudice perspective, for the Court to "find[] otherwise" would violate the foregoing and "would allow the same law firm that argued for the patentability of Nasdaq's inventions to represent parties adverse to Nasdaq in this suit who are arguing those very same patents are invalid." *Id.* at 9.

The Order should be affirmed because the Magistrate Judge "carefully considered the submissions of the parties" in all aspects, including Fish's arguments regarding prejudice, the cost to retain additional counsel, and even the time billed by Fish to its successive representations of Nasdaq and MIAX. Dkt. 69 at 36-39. Contrary to Fish's contention, Dkt. 107-1 at 33, the Magistrate Judge

31

acknowledged the arguments Fish submitted regarding the prejudice MIAX would suffer if Fish were disqualified, and found them to be "unpersuasive," Order at 10, reasoning that whatever alleged prejudice that befalls MIAX is mitigated by the fact that "MIAX has been represented by two sets of attorneys from the outset of this litigation," and "Reed Smith's representation of MIAX can continue uninterrupted." *Id.*; *see Barry v. Medtronic, Inc.*, No. 1:14-cv-104, 2015 WL 12915556, at *9-10 (E.D. Tex. Aug. 14, 2015) (disqualifying firm as trial counsel in patent case, finding that any "inconvenience and duplication of effort" for co-counsel to now take the lead creates no substantial hardship because co-counsel had been retained since inception of case).

Magistrate Judge Arpert's analysis is sufficient, and not reversible error, as other courts have not hesitated to disqualify "mega-firms" such as Fish under similar circumstances and after applying a balancing test. *See, e.g.*, *In re Relativity Media, LLC*, Case No. 18-11358, 2018 Bankr. LEXIS 2037, at *19-20 (Bankr. S.D.N.Y. July 6, 2018) (disqualifying debtors' counsel in bankruptcy case despite being "painfully aware that if Winston & Strawn is disqualified from handling the litigation it could have devastating effects on the Relativity debtors. It will almost undoubtedly affect the litigation schedule and the other proceedings that have been scheduled. But Netflix also has rights here, which it has diligently sought to protect. The debtors and Winston & Strawn, for their own reasons, proceeded with

their eyes open and with full awareness of the risks of proceeding that way. To some extent, quite frankly, it was a bit reckless to do so. And while it might be harmful to the debtors, I cannot allow that to override Netflix's rights here."); Order Granting Plaintiff's Motion to Disqualify and Setting Status Conference, *Skybell Techs., Inc. v. Ring, Inc.* Case. No. 8:18-cv-14 (C.D. Cal. Sept. 18, 2018), Dkt. 68 at 22 ("While disqualification may seem like a drastic result from Orrick's perspective, Orrick was aware that disqualification was a risk when [attorney] Roberts joined the firm, and SkyBell should not be the one to pay for Orrick's failure to meet the ethical requirements here. Therefore, policy considerations weigh in favor of disqualification.").

Similarly, here, while disqualification may seem "drastic" to Fish, Fish already prepared MIAX for Fish's disqualification when it had MIAX retain *two sets of counsel* from the inception of the case. Indeed, the Magistrate Judge observed that the hardships imposed by Fish's disqualification on MIAX is attenuated by the fact that "MIAX has been represented by two sets of attorneys from the outset of this litigation." Order at 10. Because "Reed Smith's representation of MIAX can continue uninterrupted," *id.*, the Magistrate Judge's determination of the relative hardships to the parties was not clearly erroneous or contrary to law. The threat to the integrity of the legal profession posed by Fish's continued representation far surpasses any hardship to MIAX.

On the equities, it is understandable why MIAX would want to benefit from Fish's intimate knowledge of Nasdaq's intellectual property strategies and theories in the electronic trading technology field. That, however, is precisely why the governing rules of professional conduct required Fish either to decline to represent MIAX or to seek consent and a waiver from Nasdaq beforehand . Fish did neither. Instead, Fish agreed behind the scenes to represent MIAX in a matter in which the very patents Fish prosecuted for Nasdaq and trade secrets from the same technological field are asserted against MIAX. While Fish claims that it will not participate in "that portion" of this lawsuit relating to the patents it prosecuted, the Court need only look to the single motion to dismiss filed by MIAX to determine that such a division of labor—even if Fish rigorously respected the boundary, which appears to be in grave doubt—is not practicable in this case. Dkt. 28-1.

MIAX's brief includes coordinated invalidity arguments that do not differ from patent to patent, making it impossible to verify what attorneys (or which firm) worked on what part(s) of the brief, at what point in time those part(s) were combined into a single brief, and what mechanisms were in place to keep Fish from actually reviewing or participating in any arguments pertaining to the Nasdaq Patents. Indeed, the joint representation arrangement between Fish and Reed Smith cannot possibly be sufficient to keep the counts separated by law firm throughout the case in a way that assures Nasdaq that the confidential information Fish has

obtained from representing Nasdaq over thirteen years are not now being used to Nasdaq's detriment. In other words, Fish's piecemeal representation of MIAX—or Reed Smith and Fish's joint representation of MIAX— is a violation of Fish's duty of loyalty to Nasdaq and not workable in practice, because Nasdaq cannot be assured that certain "counts" are actually quarantined from Fish and that Fish is not using the confidences it gained from Nasdaq over the course of its prior representation for MIAX's benefit. *See* Dkt. 54-1 at 11-12.

Finally, and contrary to Fish's suggestion, there is no requirement that the Magistrate Judge must attempt to fashion a less drastic or costly solution before ordering disqualification. Dkt. 107-1 at 35-37 & n.9 (demanding that the Court attempt to "significantly reduce [the] costs" to MIAX, or to "bifurcate" the lawsuit so that the "NASDAQ patents [are not] litigated concurrently with the ISE, FTEN, and trade secret issues," or to find an ethical "screen" to be a sufficient substitute). Under RPCs 1.9(a) and 1.10(a), continued representation by a conflicted firm is permitted only if the affected client consents. Dkt. 73 at 14. Fish has not requested consent and Nasdaq has determined, under all the circumstances, to withhold it given its legitimate concerns, including upholding the integrity of the profession and the litigation process; its right to the continued loyalty of former counsel and the safeguarding of its information pursuant to RPC 1.6; the depth and scope of Fish's prior work and counseling in the same technological space and on the same

IP assets being asserted here against MIAX (as well as the related sensitive information Fish acquired or had access to and Fish's ability to use such information against Nasdaq to benefit MIAX in the case); and the sheer number of conflicted lawyers at Fish and Fish's dismissive attitude in response to these conflicts. *Id.* Courts allow conflicted counsel to continue a representation only in the most "extraordinary" and "unusual case"—the Magistrate Judge was within his discretion to order Fish's disqualification under these circumstances. *Dewey*, 109 N.J. at 219-21.

Disqualification of Fish in this case is warranted even under the *Carlyle Towers* factors. On balance, as stated in its briefing, Nasdaq would suffer more prejudice and hardship if Fish's representation of MIAX is allowed. Dkt. 54-1 at 15-17; Dkt. 73 at 13-15. By contrast, prejudice to MIAX would be minimal if Fish were to be disqualified, as the Magistrate Judge found. Considering that this case is still at the pleadings stage; that MIAX has been represented by Reed Smith since the inception of the case, whose ability to get up to speed on the facts and issues should not be overly costly in terms of time or money because, under the terms of the joint representation agreement, it was already required to work and coordinate with Fish in its joint defense of MIAX; and that Fish is responsible for creating its own conflict in this case by not disclosing it to Nasdaq, instead, going out of its way to deny the conflict, Magistrate Judge Arpert soundly exercised his discretion

36

based on a correct application of the facts to the law when he found that the facts of the case favor Fish's disqualification. *Id.*

## IV.   CONCLUSION

For the foregoing reasons, Nasdaq respectfully requests that this Court affirm Magistrate Judge Arpert's September 6, 2018 Memorandum and Order disqualifying Fish & Richardson P.C. from representing MIAX in this case.

Dated:  October 1, 2018                    Respectfully submitted,

By:  s/ Michael Critchley, Sr.
        Michael Critchley, Sr.
        Critchley, Kinum & DeNoia, LLC
        75 Livingston Ave, Suite 303
        Roseland, New Jersey 07068
        Telephone: (973) 422-9200
        mcritchley@critchleylaw.com

        Arun S. Subramanian (*pro hac vice*)
        Jacob W. Buchdahl (*pro hac vice*)
        Mark Hatch-Miller (*pro hac vice*)
        Susman Godfrey L.L.P.
        1301 Avenue of the Americas, 32nd Floor
        New York, New York 10019
        Telephone: (212) 336-8330
        asubramanian@susmangodfrey.com
        jbuchdahl@susmangodfrey.com
        mhatchmiller@susmangodfrey.com

        Floyd G. Short (*pro hac vice*)
        Susman Godfrey L.L.P.
        1201 Third Avenue, Suite 3800
        Seattle, Washington 98101
        Telephone: (206) 516-3880
        fshort@susmangodfrey.com

Meng Xi (*pro hac vice*)
Susman Godfrey L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100
mxi@susmangodfrey.com

***Attorneys for Plaintiffs Nasdaq, Inc., Nasdaq ISE, LLC, and FTEN, Inc.***

38