<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **NASDAQ INC.,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **MIAMI INTERNATIONAL HOLDINGS, INC.,** *et al.*, <br><br> Defendants. | Civil Action No. 17-6664 (ZNQ) (DEA) <br><br> **OPINION** |

<u>**QURAISHI, District Judge**</u>

 **THIS MATTER** comes before the Court upon two motions: a Motion to Dismiss or Stay and Bifurcate Counterclaims (ECF No. 224) filed by Plaintiffs Nasdaq, Inc., Nasdaq ISE, LLC, and FTEN, Inc. (collectively, "Plaintiffs"), and a Motion for Judgment on the Pleadings (ECF No. 250) filed by Defendants Miami International Holdings, Inc., Miami International Securities Exchange, LLC, MIAX PEARL, LLC, and Miami International Technologies, LLC (collectively, "Defendants").

 In support of their Motion to Dismiss, Plaintiffs filed a Memorandum of Law ("MtD Moving Br.", ECF No. 224-1). Defendants opposed ("MtD Opp.", ECF No. 238), and Plaintiffs replied ("MtD Reply", ECF No. 251).

 In support of their Motion for Judgment on the Pleadings, Defendants filed a Memorandum of Law ("MJoP Moving Br.", ECF No. 216-1). Plaintiffs opposed ("MJoP Opp.", ECF No. 248), and Defendants replied ("MJoP Reply", ECF No. 246).

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will GRANT-IN-PART and DENY-IN-PART Plaintiffs' Motion to Dismiss Defendants' Counterclaims and it will DENY Defendants' Motion for Judgment on the Pleadings.

## I.      BACKGROUND AND PROCEDURAL HISTORY

### A.      FACTUAL BACKGROUND[1]

This case began as a suit for patent infringement and trade secret misappropriation, but it has since evolved into a suit for trade secret misappropriation and countersuit for antitrust violations.

In early 2011 a series of Nasdaq employees left Nasdaq to join MIAX (Nasdaq-to-MIAX Employees, or "NTMEs"). (Compl. ¶ 28, ECF No. 1.) Prior to their departure, some of the former senior Nasdaq employees forwarded to personal email accounts internal technical documents that contained information Nasdaq maintained as trade secrets or improperly acquired and retained such documents. (*Id*. ¶¶ 29–32.) In 2014, "unbeknownst to Nasdaq," the United States Patent Office ("USPTO") issued U.S. Patent No. 8,868,461 ("the '461 Patent") based on an application ("the '461 Application") filed in December 2013 by six of the NTMEs, together with others not previously employed by Nasdaq. (*Id*. ¶ 33.) The '461 Patent disclosed a data storage architecture and process that "bears a striking resemblance" to Nasdaq's confidential, proprietary, and trade secret design. (*Id*. ¶ 34.) Accordingly, based on the foregoing, and on "information and belief," Plaintiffs allege that MIAX's trading platforms are using their trade secrets. (*Id*. ¶ 35.)

---

[1] For the purposes of considering the Motion for Judgment on the Pleadings, the Court accepts all allegations in the Complaint as true. *See Zimmerman v. Corbett*, 873 F.3d 414, (3d Cir. 2017).

### B.     PROCEDURAL HISTORY

Given its nearly six-year tenure, this case has a lengthy but relevant history.  In December 2017, Defendants filed a Motion to Dismiss the Complaint.  (*See* ECF No. 28.)  Before a decision was rendered, MIAX filed a Motion to Stay this action because it had filed petitions for Covered Business Method Patent Review ("CBMR") of the patents then in suit with the USPTO's Patent Trial and Appeal Board ("PTAB"). (ECF No. 72.)  In August 2018, the Court denied MIAX's Motion to wait to see whether the PTAB took up the petitions for review.  (ECF No. 103.)  In December 2018, the Court entered an Order staying the case because the PTAB had elected to institute CBMR on all of the patents. (ECF No. 130.)

In November 2019, Nasdaq informed the Court the PTAB had issued decisions finding the patents in suit were invalid.  (ECF No. 135.)  The case remained stayed, however, while the parties awaited a decision by the United States Supreme Court in *United States v. Arthrex* that related to the proper authority and review of decisions rendered by the PTAB's Administrative Patent Judges.  In June 2021 the Supreme Court decided *Arthrex*, and the undersigned was assigned to this matter.  The parties sought and obtained an extension of the stay pending issuance by the USPTO of procedures for PTAB decisions like the one in this case that were impacted by the *Arthrex* decision.  (ECF No. 162.)

In August 2021, Defendants filed an Answer to the Complaint that asserts a lengthy series of counterclaims.  (ECF No. 170.)  Counterclaim Counts I–VIII allege *Walker-Process*-type and sham-litigation-type claims under federal and New Jersey state law.  (*Id*. ¶¶ 291–356.)  Counts IX–XXII seek declaratory judgments of non-infringement, invalidity, and unenforceability of the patents in suit.  (*Id*. ¶¶ 357–428.)

On stipulation by the parties, the stay of this matter was lifted in June 2022 (ECF No. 189), and Plaintiffs' patent infringement claims were dismissed with prejudice (ECF No. 190).[2]  This effectively mooted Defendants' declaratory judgment counterclaims, and left remaining only Plaintiffs' trade secret misappropriation claims (Complaint Counts VIII–X) and Defendants' antitrust counterclaims (Counterclaim Counts I–VIII).  As a matter of posture, it should be noted that Plaintiffs have not yet Answered the Counterclaims because Plaintiffs elected instead to move to dismiss them.

In January 2023, at Plaintiffs' request and over Defendants' objections, the Court appointed a Special Discovery Master to assist with discovery because it had become "clear to the Court that this matter will continue to require intensive case management involving the resolution of numerous additional discovery and other disputes" and the level of case management required is "untenable given the burdens on the District of New Jersey."  (ECF No. 268.)

## II.    JURISDICTION

The Court has original subject matter jurisdiction over the parties' claims under federal law pursuant to 28 U.S.C. §§ 1331, 1836 and supplemental jurisdiction over the parties' claims under state law pursuant to 28 U.S.C. § 1367.

## III.    LEGAL STANDARD

### A.    RULE 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  On a motion to dismiss for failure to state a claim, the moving party "bears the burden of showing that no claim has been presented."  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr*

---

[2] The parties' 2022 stipulation actually dismissed remaining patent infringement Counts I–II and IV–VII of the Complaint.  Count III had already been dismissed by stipulation of the parties in 2018.  (ECF No. 100.)

*Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)); *Haney v. USA Gymnastics, Inc.*, Civ. No. 21-07213, 2022 WL 909871, at *2 (D.N.J. Mar. 29, 2022).   When reviewing a motion to dismiss for failure to state a claim, courts first separate the factual and legal elements of the claims, and accept all of the well-pleaded facts as true. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).   While Federal Rule of Civil Procedure 8(a)(2) does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

Thus, to survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face."   *Id.* at 570; *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   All reasonable inferences must be made in the plaintiff's favor.   *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).

**B.      RULE 12(c)**

Federal Rule of Civil Procedure 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."   A movant seeking judgment on the pleadings must establish: (1) that no material issue of fact remains to be resolved; and (2) the entitlement to judgment as a matter of law.   *See Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (citing *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988)). In resolving a motion made pursuant to Rule 12(c), the Court must view the facts

in the pleadings and the inferences therefrom in the light most favorable to the non-movant. *See id.*

Although a motion for judgment on the pleadings is filed after the pleadings have been closed, it is reviewed under the same standards that apply to a motion to dismiss made under Rule 12(b)(6).  *See Szczurek v. Pro. Mgmt. Inc.*, 627 F. App'x 57, 60 (3d Cir. 2015) (citing *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010)); *see also Muhammad v. Sarkos*, Civ. No. 12-7206, 2014 WL 4418059, at *1 (D.N.J. Sept. 8, 2014) (citing *Turbe v. Gov't of Virgin Islands,* 938 F.2d at 428); *Gebhart v. Steffen*, 574 F. App'x 156, 157 (3d Cir. 2014).

## IV.   DISCUSSION

### A.   MOTION TO DISMISS OR STAY AND BIFURCATE COUNTERCLAIMS

#### 1.   Defendants' Counterclaims Will be Stayed and Bifurcated

In their Motion to Dismiss the Counterclaims, Plaintiffs seek in the alternative to stay and bifurcate the counterclaims pending resolution of Plaintiffs' trade secret misappropriation claims. They argue that because Defendants' counterclaims depend on a finding that Plaintiffs' claims are objectively baseless—"and Plaintiffs' suit cannot be baseless if it obtains relief on its claims"— bifurcating and staying the counterclaims would have the benefits of streamlining issues for trial and promoting judicial economy.  (MtD Moving Br. at 29.)  Plaintiffs contend that it has become standard practice for Courts to invoke Rule 42(b), to stay and bifurcate sham litigation counterclaims.  (*Id*. at 30–34) (citing cases).

Unsurprisingly, Defendants object to staying and bifurcating their counterclaims.  They argue that Plaintiffs already sought this relief from the Magistrate Judge and were denied, making the Magistrate Judge's ruling law of the case.  (MtD Opp. at 3 n.3.) (citing Order issued October 4, 2022, ECF No. 233.)  In the alternative, they incorporate by reference their prior letter brief to the Magistrate Judge.  (*Id*.) (citing ECF No. 225.)

Plaintiffs reply that their application for a stay, and the Magistrate Judge's ruling, was limited to the interim period until this Court decided the pending Motion to Dismiss or Stay and Bifurcate.  (MtD Reply at 15.)

Having considered the parties' arguments, the undersigned agrees that the counterclaims should be stayed and bifurcated for the following reasons.  First, staying and bifurcating the counterclaims has the practical effect of closing the pleadings in this matter for now.  This permits the Court to take up Defendants' Motion for Judgment on the Pleadings, which would otherwise be procedurally improper under Rule 12(c) because such motions are generally to be filed and considered "after the pleadings have closed."  Fed. R. Civ. P. 12(c).  Second, while discovery appears to have progressed to some degree since October 2022, the parties have had no small amount of difficulty, as demonstrated by successive motions to compel (ECF Nos. 239, 265), the Court's conclusion that appointment of a Special Discovery Master was warranted (ECF No. 284), and an outstanding appeal from a decision issued by that Special Master (ECF No. 300).  Bifurcating and staying the counterclaims has the benefit of focusing and expediting the parties' discovery on the issues raised by Plaintiffs' trade secret misappropriation claims.  Finally, as Plaintiffs point out, there is merit in narrowing the issues for either summary judgment or trial (if needed), thus preserving the parties' resources, promoting judicial economy, and avoiding potential jury confusion.  All of these reasons favor staying and bifurcating Defendants' counterclaims pending resolution of Plaintiffs' trade secret misappropriation claims.  Accordingly, the Court will enter an appropriate order to do so.

### B.      MOTION FOR JUDGMENT ON THE PLEADINGS

#### 1.      The DTSA Claim Does Not Pre-date the Statute

In their Motion for Judgment on the Pleadings, Defendants challenge the Complaint's trade secret misappropriation claim under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C.

§ 1836 on the basis that the statute does not cover acts of misappropriation that occurred on or before May 11, 2016, when the statute was enacted. (MJOP Moving Br. at 19.) They argue that the Complaint alleges no well-pled facts showing misappropriation after that date. (*Id*. at 20.) The misappropriation by NTMEs occurred prior to 2012, and the patent application that issued as the '461 Patent was filed in 2013 and published in 2014. Defendants concede that the Complaint alleges some misappropriation conduct after 2016, but they maintain that these are merely conclusory, information-and-belief allegations of continuing misuse. Defendants therefore urge the Court to ignore the allegations under a Rule 12 analysis, and argue that—even if the allegations were to be considered—they must fail because the DTSA does not recognize a theory of continuing misappropriations. Rather, a DTSA claim arises once at the time of the initial appropriation. The Court disagrees for the following reasons.

The DTSA creates a private right of action under federal law for the misappropriation of trade secrets. 18 U.S.C. § 1836(b)(1). Misappropriation can be established in three ways: improper acquisition, disclosure, or use of a trade secret without consent. 18 U.S.C. § 1839(5). The statute applies to "any misappropriation of a trade secret . . . for which any act occurs on or after the date of the enactment of the Act." Pub. L. No. 114-153. Courts in the Third Circuit have interpreted the DTSA to apply to misappropriations occurring before the statute's enactment where a plaintiff alleges "pre-enactment acquisition of a trade secret coupled with post-enactment continued use." *Marimar Textiles, Inc. v. Jude Clothing & Accessories Corp.*, Civ. No. 17-2900, 2017 WL 4391748, at *6 (D.N.J. Oct. 2, 2017) (collecting cases); *see also Teva Pharma. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 674–75 (E.D. Pa. 2018) ("Misappropriation, as defined in the DTSA, includes unauthorized 'use,' not just acquisition of a trade secret. Thus, one who acquired and used a trade secret before enactment of the DTSA and continued to use it after enactment is

liable." (citations omitted)).   The Third Circuit has implicitly validated this approach to pre-enactment acquisition/post-enactment use.  *See Oakwood Labs LLC v. Thanoo*, 999 F.3d 892, 908 n.16 (3d Cir. 2021) (noting that "[w]e focus only on the 'use' of the trade secret . . . because all of Oakwood's allegations regarding acquisition and disclosure reference dates that took place prior to . . . the date when the DTSA became effective," and ultimately reversing the district court's dismissal because the panel found the complaint's "use" allegations stated a plausible claim under DTSA.)  Here, the Court finds the following paragraph of the Complaint relevant insofar as it specifically alleges Defendants have used Plaintiffs' trade secrets at least as recently as 2017 in Defendants' MIAX Pearl exchanges:

> 136. MIAX's acquisition, use, and disclosure of the Nasdaq Trade Secrets provided significant competitive benefit to MIAX, particularly in its development and unveiling of MIAX Options and MIAX Pearl—two electronic exchanges launched nationally on December 7, 2012 and February 6, 2017, respectively. MIAX continues to operate these two exchanges today.

(Compl. ¶ 136.)  Accordingly, the Court finds that the Complaint's DTSA claim (Count VIII) does not fall outside the scope of the statute.

### 2.     The NJTSA Claim Does Not Pre-Date the Statute

According to Defendants, Plaintiffs' claim under the New Jersey Trade Secrets Act ("NJTSA"), N.J.S.A. §56:15-2,  also fails because the misconduct alleged pre-dates the NJTSA's effective date of January 5, 2012.  According to Defendants, the gravamen of the Complaint's NJTSA claim is grounded in the pre-2012 activity of the NTMEs or the inevitable disclosure and use doctrine.  Here again, the Court disagrees.

The NJTSA prohibits the misappropriation of a trade secret.  N.J.S.A. § 56:15-3.  It defines misappropriation of a trade secret to include:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that a person acquired the trade secret by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent of the trade secret owner by a person who:

(a) Used improper means to acquire knowledge of the trade secret; or

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was derived or acquired through improper means; or

(c) Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired through improper means.

N.J.S.A. § 56:15-2.   Accordingly, "disclosure or use of a trade secret" constitutes a misappropriation.

There are indeed suggestions that NJTSA is less generous with respect to its application to conduct prior to its January 5, 2012 effective date.  *See* 2011 N.J. Laws 161 § 10 ("With respect to a continuing misappropriation that began prior to the effective date, the Act does not apply to the continuing misappropriation that occurs after the effective date."); N.J.S.A. § 56:15-8 (For the purposes of this section, a continuing misappropriation constitutes a single claim.)  Moreover, the Third Circuit's decision in *Oakwood* explicitly declined to address the NJTSA in the same way it addressed the DTSA, *Oakwood*, 999 F.3d at 908 n.16 (observing that the complaint's allegations "may, however, suffice as support for similar claims under the NJTSA—though we do not need to decide that here"), and the only court in this District to consider this issue in any depth dismissed an NJTSA claim based on pre-enactment misappropriation.  *See Mu Sigma, Inc. v. Affine, Inc.*, Civ. No. 12-1323, 2013 WL 3772724, at *8 (D.N.J. July 17, 2013) ("Plaintiff's reliance on the [NJTSA] is misplaced because the [it] 'does not apply to misappropriation occurring before the effective date' of the Act, which was January 5, 2012. . . .  The bulk of the allegations relating to

misappropriation of [p]laintiff's confidential information by the Founders took place in 2010, and [p]laintiff filed this suit in state court in 2011, which occurred prior to the passage of the T.S.A. As such, based on the timing, the T.S.A. cannot address these alleged wrongdoings."); *see also Air Express Int'l v. Log-Net, Inc.*, Civ. No. 12-1732, 2016 WL 5334659, at *2 (D.N.J. Sept. 22, 2016) (quoting *Mu Sigma* in *dicta*).

The Court, however, finds *Mu Sigma* readily distinguishable insofar as the Complaint in this matter was filed well after the enactment of the NJTSA, and its pleadings allege "disclosure" and "use"-type misappropriation under the statute against the corporate Defendants—not the NTMEs that the Complaint alleges improperly took the trade secret information.   Here, Defendants' conduct began with a filed patent application on December 6, 2013 that disclosed Plaintiffs' trade secrets, which was after the NJTSA's effective date.   (Compl. ¶¶ 33–34, 141, 151.)[3]   Likewise, the Complaint alleges that Defendants launched its MIAX Options and MIAX Pearl exchanges in December 2012 and February 2017, respectively, which are also after the NJTSA's January 5, 2012 effective date.   (Compl. ¶ 152.)   Accordingly, the Court finds that the Complaint plausibly alleges that Defendants—as opposed to the NTMEs—have violated the NJTSA after its effective date.

### 3.   The Trade Secret Misappropriation Claims are Not Time-Barred Under the Relevant Statutes of Limitations

In their Motion for Judgment on the Pleadings, Defendants contend that all of Plaintiffs' trade secret misappropriation claims (Counts VIII–X) are barred as untimely.   In Defendants' view, Plaintiffs' claim accrued in 2011 when the NTMEs left to work for Defendants, especially given

---

[3] The '461 Application published on June 12, 2014.   This is not alleged in the Complaint, but the Court takes judicial notice of this fact as a matter of public record and because this information is available on the face of the '461 Patent, which is referenced by the Complaint.   *See Wolfington v. Reconstructive Orthopaedic Assoc. II, PC*, 935 F.3d 187, 195 (3d Cir. 2019).   Because both the filing of the application and the publication of the application took place after the effective date of the NJTSA, the Court need not resolve which event constitutes the disclosure-type violation.

Plaintiffs' professed belief that the NTMEs use of Nasdaq's alleged trade secrets at MIAX was "inevitable." (MJOP Moving Br. at 14–17.) Separately, Defendants argue that Plaintiffs were also on constructive notice of any purported misappropriation on June 12, 2014, when Defendants' patent application published that showed what Plaintiffs allege was a "striking resemblance" to Plaintiffs' trade secrets. (*Id*. at 17–19.)

In response, Plaintiffs emphasize the general rule that because a statute of limitations defense is an affirmative one, it can only be resolved on a Rule 12 motion in the rare case when a plaintiff effectively pleads itself out of court by alleging facts that are sufficient to establish the defense. (MJOP Opp. at 16.) Specifically in this case, Plaintiffs object to Defendants' attempt to set an accrual date for Plaintiffs' claims based on the NTME's transition in 2011. Plaintiffs argue that their claims accrued when they were injured. (MJOP Opp. at 17.) Going a step further, Plaintiffs invoke the discovery rule to contend that their claims accrued when the injury caused by MIAX "was known or knowable, through the exercise of reasonable diligence." (*Id*.) (citation omitted). Plaintiffs insist that this applies to each individual instance of alleged misappropriation, and argue that the relevant question becomes when Plaintiffs knew or should have known each time that MIAX acquired, disclosed, or used their trade secrets. (*Id*.) Plaintiffs dispute Defendants' reliance on the "inevitable disclosure" allegations in their Complaint because (1) Defendants denied those allegations in their Answer, and (2) inevitability does not establish misuse at the first opportunity. (*Id*. at 18–19.) Rather it is Plaintiffs' injuries—when Plaintiffs' knew or should have known that they occurred—that matters. (*Id*. at 19.)

On reply, Defendants reiterate their position that Plaintiffs' claims were discoverable in 2011 when the NTMEs transitioned, or at least since June 2014 when the '461 Application was published. (MJOP Reply at 2–7.)

This suit was filed on September 1, 2017, and the parties agree that the DTSA and NJTSA have a three-year statute of limitations, while a trade secret misappropriation claim under New Jersey common law has a six-year statute of limitations.  The parties' dispute on this issue therefore centers on when Plaintiffs' claims accrued.  If the claims accrued prior to September 1, 2011, all of the Complaint's trade secret misappropriation claims are barred by the their respective limitations periods.  If the claims accrued prior to September 1, 2014, the DTSA and NJTSA claims should be barred.

        a)      *Plaintiffs' Claims Did Not Accrue in 2011 Based on the Complaint*

Having reviewed the Complaint, the Court readily rejects Defendants' contention that Plaintiffs' misappropriation claims accrued in 2011 when the NTMEs made their transition to MIAX.  Defendants' inevitable disclosure argument lacks merit.  While the Complaint does raise the issue of inevitable disclosure and/or misappropriation, it does so in a different context.  As Plaintiffs point out, those allegations are prospective in nature, and are directed to the likelihood of a future inevitable disclosure of trade secrets in the employee's possession that might warrant the entry of preliminary injunction against its employee.  This is apparent from the relevant paragraphs of the Complaint:

> 163.  In violation of Nasdaq's rights, the MIAX Defendants have actually misappropriated and/or threaten to *inevitably misappropriate* Nasdaq's confidential, proprietary, and trade secret information in violation of New Jersey law, in the improper and unlawful manner as alleged herein.
>
> 171.  As the direct and proximate result of MIAX's conduct, Nasdaq has suffered, and if MIAX's conduct is not stopped, will continue to suffer severe competitive harm, irreparable injury, and significant damages, including lost profits, reasonable royalties, and other damages as set forth herein, in an amount to be proven at trial. MIAX has been, will be or is being unjustly enriched by the misappropriation of Nasdaq's trade secrets and, unless retrained, will continue to threaten to use, actually use, divulge, *inevitably*

13

> *disclose, acquire, distribute, and/or otherwise misappropriate*
> Nasdaq's trade secrets.

(Compl. ¶¶ 163, 171) (emphases added).  Even if Plaintiffs were aware in 2011 that the NTMEs were leaving and that they were leaving for MIAX, Plaintiffs' position—taken six years later in their 2017 Complaint—cannot reasonably be used retroactively against them as an admission that they appreciated or should have appreciated their trade secret misappropriation claims in 2011.[4] In short, Court finds no grounds in law or fact to impute notice to Plaintiffs of their injuries based on their inevitable disclosure allegations.[5]

### b)   Whether Plaintiffs' DTSA and NJTSA Claims Accrued in 2014

In the alternative, Defendants argue that the statute of limitations on Plaintiffs' misappropriations claims should have begun to run from June 12, 2014, when the '461 Application published, putting Plaintiffs on either actual or constructive notice.  (MJOP Moving Br. at 18–19).

Plaintiffs respond that it would be improper for the Court to determine, based on the pleadings alone, whether they knew or should have known about the publication of the '461 Application.  (MOP Opp. at 22.)  Plaintiffs insist that courts around the county have found that the publication of a patent application is not enough, a plaintiff must have been under a duty to inquire that arose after sufficient facts were available to provoke a reasonable person to investigate their contents.  In the absence of such facts discernible from the Complaint, it is this factually intensive inquiry that courts should avoid.  (*Id*. at 23.)

---

[4] In the undersigned's view, imputing "inevitable disclosure" in this way is impractical in at least one sense:  it risks motivating "protective" trade secret misappropriation claims among previous-employer plaintiffs seeking to enforce a confidentiality provision or covenant not to compete against employees who are leaving to join a competitor.
[5] Insofar as the Court rejects Defendants' principle position with respect to a 2011 claim accrual, it does not reach Plaintiffs' counter-argument that Defendants' admissions to the relevant allegations in their Answer should technically preclude Defendants from asserting their position on a motion for judgment on the pleadings.

On reply, Defendants cite competing cases in which courts have found that patent application publication or issuance suffices to put a plaintiff on notice and trigger the start of the statute of limitations period.  (MJOP Reply at 10–12.)

The Court begins its analysis with the text of the relevant statutes.  DTSA includes its own statute of limitations:

> Period of limitations.--A civil action [brought by a private party] . . . may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered. For purposes of this subsection, a continuing misappropriation constitutes a single claim of misappropriation.

18 U.S.C. § 1836(d).  The NJTSA includes a similar provision:

> An action for misappropriation shall be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this section, a continuing misappropriation constitutes a single claim.

N.J.S.A. § 56:15-8.  Accordingly, the statutes of limitations for both the DTSA and the NJTSA explicitly incorporate a discovery rule.[6]  The question before the Court is whether, based on the facts as alleged in the Complaint, Plaintiffs were on notice of their claims.  Defendants urge the Court to find that the limitations periods for the DTSA and NJTSA claims were triggered as of the date of the 2014 publication of the '461 Application.

As a first matter, the Complaint does not allege that the '461 Application was published at all, much less its date of publication.  The Court need not take judicial notice of its publication for this purpose, because it rejects the underlying premise.  Courts in this Circuit have indeed split as to the effect of a patent publication.   In the District of Delaware alone there are a series of

---

[6] Though less relevant based on the timing of events in this case, the same discovery rule also applies to a claim for misappropriation under New Jersey common law.  *See Blystra v. Fiber Tech Group, Inc.*, 407 F. Supp. 2d 636, 644–645 (D.N.J. 2005) (citing *County of Morris v. Fauver*, 153 N.J. 80, 109 (1998)).

competing decisions.  *See Ocimum Biosolutions (India) Ltd., v. LG Chemical Ltd.*, Civ. No. 19-2227, 2022 WL 3354708, at \*9–11 (D. Del. July 31, 2022) ("But we are presently at the Rule 12(b)(6) stage—a point where the record is necessarily more limited than it would be if the issue were further litigated later in the case. And with inquiry notice being a fact-intensive question, in these circumstances, it is 'an issue on which there ought to be discovery.'"); *Lambda Optical Solutions, LLC v. Alcatel-Lucent USA Inc.*, Civ. No. 10-487, 2015 WL 5470210 (D. Del. Aug. 6, 2015) (denying motion to dismiss); *Capricorn Pharma v. Matrixx Initiatives, Inc.*, Civ. No. 08-873, 2009 WL 2567022 (D. Del. Aug. 19, 2009); *Raza v. Siemens Med. Sols. USA Inc.*, 607 F. Supp. 2d 689, 693 (D. Del. 2009) (granting motion to dismiss and observing that "[c]ourts have recognized that the public disclosure of products, as well as the publicly noticed filing of patent protection constitutes, at a minimum, constructive knowledge for purposes of discovering a claim based on the misappropriation of trade secrets and commencing the limitations period under the statute")

From these cases, and others cited by the parties (*see* MJOP Moving Br. at 18–19; MJOP Opp. at 22–24; MJOP Reply at 10–12), the Court understands that: (1) the publication of a patent or patent application allegedly containing a trade secret is an important factor in assessing whether a trade secret misappropriation claimant should have, through the exercise of reasonable diligence, discovered the misappropriation; but (2) it is not necessarily dispositive, and other factors can and should play a role in the inquiry.  In engaging in this inquiry, a court should also examine whether there is evidence of fraudulent concealment (if alleged), and/or whether any other evidence exists to show that the claimant should our should not have been on notice of the alleged misappropriation.

In reaching this conclusion, the undersigned joins those courts who recognize that "[i]t would be unreasonable (that is to say, it would impose costs far in excess of any conceivable benefits) to impose a duty to monitor all patent applications on every company that maintains an active patent portfolio. A duty to investigate a patent application should arise 'only when sufficient facts were available to provoke a reasonable person to investigate their contents,' *i.e.,* 'reason to suspect a potential misappropriation of its confidential information, such that it was under a duty to investigate the contents of [defendant's] published patent applications.'" *Ferris Mfg. Corp v. Carr*, Civ. No. 14-4663, 2015 WL 279355, at *4 (N.D. Ill. Jan. 21, 2015).

Here, it is clear from the Complaint that Plaintiffs were aware at some point that at least a dozen NTMEs had joined Defendants by 2011. (*See* Compl. ¶ 28.) In an effort to charge Plaintiffs with knowledge in 2011, Defendants argue that the Court should take judicial notice of a publication announcing the NTMEs' transition. (MJOP Moving Br. at 15–16) (citing April 2011 Dow Jones newspaper article). The Complaint and the newspaper article, however, raise more questions than they answer with respect to whether a reasonable claimant would have been put on inquiry notice by the transitioning employees. Notably, there are no facts in the record with respect to the frequency with which Plaintiffs' employees left to join competitors, or employees in this field generally shift employment. Likewise, there are no facts in the record as to the volume of patent applications filed by the parties in this case, much less by the industry as a whole. Accordingly, based on the facts alleged in the Complaint viewed in a light most favorable to Plaintiffs, the Court cannot find that Plaintiffs had reason to suspect a misappropriation sufficient to impose a duty to investigate Defendants' patent activities, such that their claims should be dismissed at this early stage of the case for failure to timely act on them. The Court therefore further finds that, on this record, the publication of the '461 Patent Application did not trigger the

statutes of limitations for Plaintiffs' misappropriation claims.  In reaching this conclusion, the Court is well aware that it may be called to revisit this issue on summary judgment after discovery and briefing provides a more developed record.

> ### 4.   The Complaint Does Not Fail to Plead Plausible Claims Under DTSA, NJTSA, and/or Common Law

Defendants seek to dismiss the Complaint's trade secret misappropriation claims under DTSA, NJTSA, and New Jersey common law for failure to state a claim.  Defendants challenge the adequacy of the pleadings with respect to (1) the Complaint's definition of Plaintiffs' purported trade secrets and (2) the Complaint's allegations that Defendants misappropriated the information when they knew or should have known that they were trade secrets.

Both the DTSA and the NJTSA require a plaintiff "to demonstrate (1) the existence of a trade secret, defined broadly as information with independent economic value that the owner has taken reasonable measures to keep secret, and (2) misappropriation of that secret, defined as the knowing improper acquisition and use or disclosure of the secret." *Par Pharm., Inc. v. QuVa Pharm, Inc.*, 764 F. App'x 273, 278 (3d Cir. 2019).  Courts in this district "fold" the DTSA analysis into the NJTSA review.  *Scherer Design Grp. LLC v. Schwartz*, Civ. No. 18-3540, 2018 WL 3613421, at *4 (D.N.J. July 16, 2018).  New Jersey common law similarly requires, *inter alia*, that a trade secret was "acquired by the competitor with knowledge of the [employee's] breach of confidence, and [] used by the competitor to the detriment of the plaintiff." *Rohm & Haas Co. v. ADCO Chem. Co.*, 689 F.2d 424, 429–430 (3d Cir. 1982) (citing *Stone v. Goss*, 65 N.J. Eq. 756, 759–60 (1903)); *Ferroline Corp. v. General Aniline & Film Corp.*, 207 F.2d 912, 921 (7th Cir. 1953) (applying New Jersey law), *cert. denied*, 347 U.S. 953 (1954)); *see also P.C. of Yonkers, Inc. v. Celebrations! The Party and Seasonal Superstore, LLC*, Civ. No. 04-4554, 2007 WL

708978, at *10 (D.N.J. Mar. 5, 2007).   Therefore, this Court will consider the challenges to the claims together.

a)   *The Complaint Adequately Alleges Trade Secret*

A complaint must identify purportedly trade secret information "with enough specificity to place a defendant on notice of the bases for the claims being made against it."   *Oakwood*, 999 F.3d at 906 (citation omitted).   A complaint, however, "need not spell out the details of the trade secret to avoid dismissal."   *Id*. (internal quotation marks omitted).   "Rather, the subject matter of the trade secret must be described with sufficient particularity to separate it from mattes of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least boundaries within which the secret lies."   *Id*. (internal quotation marks omitted).   This is a "fact-specific question to be decided on a case-by-case basis."   *Id.*

The Complaint includes the following relevant allegations:

> 23.   Nasdaq's renowned INET electronic trading technology platform has been an essential component in Nasdaq's business strategy and performance since 2005. As an electronic communication network, INET is the core software engine behind all Nasdaq trading systems and also the Nasdaq Financial Framework, which Nasdaq provides commercially to other exchanges, CCPs, and CSDs, globally. INET has proven to be one of the most stable and reliable exchange technologies in the world with over 100 market operators that depend on the platform as a mission-critical component of their businesses. Nasdaq has continually raised the bar by investing in INET quality and performance. The Nasdaq solution provides unparalleled capacity and speed, supporting processing of up to five million messages per second at speeds of sub-100 microseconds on average. INET is by far the highest performing, fastest trading system among U.S. exchanges by a wide margin, and believed to power the fastest exchange platforms on the planet.

> 24. Over the years, Nasdaq has expended significant resources to develop and improve upon INET to provide Nasdaq customers with the competitive advantage of an automated system that is highly

efficient and exceptionally stable, and that reliably facilitates high-speed pairings of buy and sell orders to improve liquidity, reduce latency, assure the fair handling of orders, and diminish transaction costs to both firms and investors alike. Specifically, INET's unique middleware messaging bus, which facilitates the communication of data between different components that are connected to the messaging bus, contributes significantly to INET's reliability and performance. A number of features implemented in the messaging bus, such as its multi-tier data storage architecture and gap-fill process, have been and continue to be drivers in exchange innovation.

34. Among the MIAX '461 Patent's disclosures are a messaging bus (which has a multi-tier data storage architecture and implements a specific gap-fill process) that bears a striking resemblance to Nasdaq's own highly confidential and proprietary INET design and reflects Nasdaq's trade secrets. For example, the architecture depicted in Figure 10 and the gap-fill process described in columns 20 and 21 of the MIAX '461 Patent are nearly identical to the systems architecture, processes, and configuration that are unique to Nasdaq's INET and comprise Nasdaq's trade secrets. Accordingly, Nasdaq is informed and believes, and based thereon alleges, that MIAX brazenly used the inventions that were acquired and improperly disclosed or used by the Nasdaq-to-MIAX Employees to prepare MIAX's own patent application. Nasdaq is further informed and believes, and based thereon alleges, that MIAX has, in October 2014, received the '461 Patent on inventions that were Nasdaq Trade Secrets, which were provided to the Nasdaq-to-MIAX Employees under confidentiality and nondisclosure obligations in the course of their employment with Nasdaq.

The Court finds that paragraphs 23 and 24 of the Complaint provide sufficient description of the nature of Plaintiffs' alleged trade secrets. Moreover, paragraph 34 describes, indirectly, their trade secrets by reference to *specific* portions of a *specific* document: the '461 Patent. Together, these allegations parallel the level of description approved by the Third Circuit in *Oakwood*, and therefore suffice to meet Plaintiffs' obligations. *See* 999 F.3d at 907.

> b)      *The Complaint Adequately Alleges Defendants' Misappropriation*

The Complaint alleges that NTMEs had access to trade secret information, improperly acquired it, and disclosed it to Defendants. (Compl. ¶¶ 28–32.) Plaintiffs required employees with

access to the trade secret information to sign non-disclosure and confidentiality agreements.  (*Id.* ¶ 25.)  Technical details bearing a "striking resemblance" to that trade secret information appeared in the '461 Patent that was issued to MIAX based on an application that was filed by six of the NTMEs, together with non-former Nasdaq employees.  (*Id.* ¶¶ 33–34.)

It may be that discovery will establish that Defendants' independently developed their technology or that their technology is distinctly different from what Plaintiffs' claim as a trade secret, but the facts as alleged more than plausibly plead Defendants' misappropriation.

## V.    CONCLUSION

For the reasons stated above, the Court will GRANT-IN-PART and DENY-IN-PART the Motion to Dismiss Counterclaims (ECF No. 224), STAY and BIFURCATE the Counterclaims, and DENY the Motion for Judgment on the Pleadings (ECF No. 250).  The parties will also be instructed to confer and file a joint letter by August 1, 2023 advising to what extent the Court's decision on the above motions affects the pending appeal of the Special Master's decision (ECF No. 300).  An appropriate Order will follow.


Date: **July 25, 2023**

                                            s/ Zahid N. Quraishi
                                            **ZAHID N. QURAISHI**
                                            **UNITED STATES DISTRICT JUDGE**